UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JAMES BOWMAN, as next friend for | ) | |
| J.B., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 1:11-cv-0593-RLY-TAB |
| | ) | |
| vs. | ) | Judge Richard L. Young |
| | ) | |
| INTERNATIONAL BUSINESS | ) | Magistrate Judge Tim A. Baker |
| MACHINES CORPORATION, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## <u>COVER PAGE FOR DOCUMENT FILED UNDER SEAL</u>

Defendants' Memorandum in Support of Their Motion to Exclude Dr. Richard Goldstein

Local Rule 5.3

Protective Order filed December 16, 2011, Docket No. 32

Filed by:     Zachary D. Holmstead
              KIRKLAND & ELLIS LLP
              300 North LaSalle Street
              Chicago, Illinois 60654

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JAMES BOWMAN, as next friend for | ) | |
| J.B., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 1:11-cv-0593-RLY-TAB |
| | ) | |
| vs. | ) | Judge Richard L. Young |
| | ) | |
| INTERNATIONAL BUSINESS | ) | Magistrate Judge Tim A. Baker |
| MACHINES CORPORATION, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR
MOTION TO EXCLUDE DR. RICHARD GOLDSTEIN**

Plaintiffs hired Dr. Richard Goldstein to speculate about matters far outside his expertise—he is a statistician but performed no statistical analysis—and sponsor a methodology that has never been tested or implemented in any way. Dr. Goldstein seeks to testify about extracting and interpreting eligibility data contained in Indiana's Medicaid computer systems. But he has never seen any of these systems or a single data extract from any of them. In fact, he has never worked with a system that is even "close" to any of those systems. None of the extracts Dr. Goldstein needs actually exists, and he admitted that he does not know whether they can be created or whether it is even possible to implement his proposed methodology. His proposed methodology will have an error rate, but he has no idea what it might be.

Moreover, Dr. Goldstein openly admitted that counsel wrote key portions of his report. And he could not explain how to apply his methodology to simple scenarios without obtaining additional instructions from counsel. Plaintiffs' attempt to have Dr. Goldstein offer their theories as his "expert opinion" flatly contradicts Rule 702 and *Daubert*, and he should be excluded.

**BACKGROUND**

In this putative class action, plaintiffs have proposed certifying the following class:

> [A]ll Medicaid recipients in the State of Indiana who timely requested a fair hearing to contest the termination of their benefits, but whose benefits were nonetheless terminated before a fair hearing was held and a ruling was issued. [Dkt. 203, Pls.' Mem. of Law in Supp. of Their Mot. for Class Cert. at 2]

In support of their motion for class certification, plaintiffs hired Dr. Richard Goldstein. Dr. Goldstein is a statistician (Ex. A, 5/14/12 Report of R. Goldstein ("Report") 1), but he has not performed any statistical analysis in this case (Ex. B, Goldstein Dep. 12). Rather, he was retained "to determine how one could use relevant electronic databases" to identify Medicaid recipients "who received a notice that their benefits would be terminated, appealed their termination in a timely manner, but their benefits were interrupted or not continued pending a fair hearing on their appeal." (Report 1)

Dr. Goldstein proposed a four-step, ten-part methodology that requires the creation of various data extracts from each of Indiana's various Medicaid computer systems[1] and the sorting and electronic linking of information within those purported extracts. (Report 1–5; Goldstein Dep. 60–68, 74–79) Every single step and part requires at least one extract from these systems. (Goldstein Dep. 68 (step 1); 78–79 (step 2, part 1); 82–83 (step 2, part 2); 86–89 (step 2, part 3); 90, 105–06 (step 2, part 4); 97–99 (step 2, part 5); 102–03, 105–06 (step 3, part 1); 120–23 (step 3, part 2); 102–03, 105–06, 115–18 (step 3, part 3); 131 (step 4))

Dr. Goldstein's proposed methodology then calls for the review and interpretation of the electronically stored data, appeal documents (such as hand-typed letters requesting an appeal), and free-form caseworker notes, sometimes referred to as "CLRC" notes. (*E.g.*, Report 3–5;

---

[1]   Indiana uses the following Medicaid computer systems:  ICES; WFMS; FACTS; and the Office of Hearings and Appeals' system.  (Report 1–2)  ICES, the State's legacy system, was created in the early 1990s.  (Ex. C, Richey Dep. 105–06)

Goldstein Dep. 65–66, 84–85, 98, 103, 158)   Consequently, implementing his proposed methodology will require the exercise of subjective judgment on a case-by-case basis:

> Q.   In order to determine which particular cases were entitled to continuing benefits pending an appeal but did not receive them, you must interpret CLRC notes, appeal requests, and other materials in the case file, correct?
>
> A.  Yes.
>
> Q.  And that requires the exercise of subjective judgment, correct?
>
> A.  Yes.
>
> Q.  And that must be done on a case-by-case basis, correct?
>
> A.  Yes.  [Goldstein Dep. 120:3–14]

But Dr. Goldstein's opinions amount to mere speculation.  Dr. Goldstein fully admits that he does not know if it is even possible to implement his proposed methodology.  (*Id.* at 9:15–18.) He has not attempted to implement any portion of his proposed methodology (*id.* at 9:12–14) and does not know whether the plaintiffs in this case fit his proposed methodology (*id.* at 157:10–13).  He has not created or even reviewed a single data extract.  (*Id.* at 9:9–11, 142:7–10)  In fact, none of the extracts he proposes actually exists, and he does not even know if they can be created:

> Q.  You're not aware of any data extracts that provide the data that you need to perform your methodology, correct?
>
> A.  Correct.
>
> *       *       *
>
> Q.  And you don't know for sure whether it is possible to create the specific data extracts that you would need to carry out your proposed methodology, correct?
>
> …
>
> THE WITNESS:  Correct.  [*Id*. 106:22–107:1, 107:8–13; *see also id.* at 9, 68–69, 98–100, 128, 131]

3

Further, he believes his methodology will have an error rate, but has no idea what that rate will be.  (*Id.* at 173:8–14)

Dr. Goldstein's lack of relevant expertise further demonstrates that his opinions have no reliable basis and that he is simply speculating.  Dr. Goldstein admitted that he is not an expert in the data extraction capabilities of any Medicaid computer system.  (*Id.* at 41:9–12)  In fact, he is not an expert in *any* aspect of any Medicaid computer system.  (*Id.* at 41:2–4)  He does not have any experience with any computer system that is "close" to any of Indiana's Medicaid computer systems.  (*Id.* at 175:19–177:5)  He has "no information at all" about the Office of Hearings and Appeals' system (*id.* at 40:22–41:1) and has never seen any information or data—not even a screenshot—from some of the databases he seeks to testify about (*e.g.*, *id.* at 43:13–20).

Dr. Goldstein also acknowledged that the interpretation of appeal documents and caseworker notes falls outside any expertise he might possess.  (*Id.* at 86:7–11, 94:11–13; *see also id.* at 42:3–43:3 (Dr. Goldstein had never even seen CLRC notes before this case and is "not a Medicaid expert"))  And he did not bother to review Indiana's policies regarding when Medicaid beneficiaries who appeal are entitled to continuing benefits or read the depositions of FSSA employees on this key topic.  (*Id.* at 142–144; *see also, e.g.*, Ex. D, Sanford Dep. 10–14, 98–99).

Not only are Dr. Goldstein's opinions utter speculation, key portions of his report were prepared by plaintiffs' counsel.  For example, step 3 of his proposed methodology, which purports to filter out cases that were not entitled to continuing benefits, was written entirely by plaintiffs' counsel.  (*Id.* at 63:10–66:22, 103:20–22)  Dr. Goldstein readily admits that he does not even know all of the circumstances in which a beneficiary who timely appeals is nonetheless not entitled to continuing benefits.  (*Id.* at 103:23–104:3)  In fact, when asked whether his

4

methodology accounts for all such circumstances, plaintiffs' counsel objected on *foundation* grounds.  (*Id.* at 104:4–11)  In addition, when asked to apply his methodology to hypothetical cases, Dr. Goldstein admitted that he would need to consult with plaintiffs' counsel about how they "should be handled."  (*Id.* at 157, 159, 163–64)  In short, plaintiffs' counsel are using Dr. Goldstein to offer their hypotheses as his "expert opinion."

It is thus not surprising that third-party witnesses who do possess relevant expertise have flatly *rejected* Dr. Goldstein's method.  For example, Dr. Goldstein recognized that Joseph Reyes of First Data possesses "substantial experience and expertise in the Indiana Medicaid eligibility systems" and "substantial experience and expertise in the analysis necessary to determine whether an individual was entitled to continuing benefits but did not receive them." (Goldstein Dep. 147–148)

<p style="color:red; text-align:center;">Redacted</p>

## LEGAL STANDARD

Federal Rule of Evidence 702 and the principles announced in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), govern the admissibility of expert testimony in federal court. The "responsibility to screen expert testimony" to ensure that it is reliable lies with the Court. *Ata Airlines v. FedEx Corp.*, 665 F.3d 882 (7th Cir. 2011); *see also Daubert,* 509 U.S. at 589; *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000).  Rule 702 first requires the Court to

determine whether a proposed expert is qualified by "knowledge, skill, experience, training, or education" in the specific area he proposes to testify about.

Even if an expert is qualified, his testimony is inadmissible unless: (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.  Fed. R. Evid. 702.  Even "[a] supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method." *Clark v. Takata Corp.*, 192 F.3d 750, 759 n.5 (7th Cir. 1999).  Before allowing an expert to testify, the Court must make certain that a proposed expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

*Daubert* applies in full force at the class certification stage.  *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 812 (7th Cir. 2012); *American Honda Motor Co. v. Allen*, 600 F.3d 813, 815–16 (7th Cir. 2010).  Where, as here, an expert's opinions are critical to plaintiffs' motion for class certification, the Court should conduct a full *Daubert* analysis and determine whether to exclude the expert's report and testimony before considering plaintiffs' class motion. *Messner*, 669 F.3d at 812.  Dr. Goldstein's opinions are critical because they are the *only* means plaintiffs propose for identifying class members.  (Pls.' Mem. of Law in Supp. of Their Mot. for Class Cert. at 27–28; *see generally id.*)

## ARGUMENT

**I.     DR. GOLDSTEIN'S REPORT AND TESTIMONY SHOULD BE EXCLUDED.**

Dr. Goldstein's report and testimony should be excluded because his methodology is not "based on sufficient facts or data" and is not "the product of reliable principles and methods." Fed. R. Evid. 702.  *First*, his opinion that his methodology can be implemented is pure

speculation.  *Second*, Dr. Goldstein merely parrots the opinions of plaintiffs' counsel, who prepared critical portions of his report.  In fact, Dr. Goldstein is so reliant on plaintiffs' counsel that he doesn't know how to carry out his proposed methodology without asking them how to do it.  *Third*, Dr. Goldstein has failed to review basic, fundamental materials in this case and made no effort to familiarize himself with the FSSA's computer systems.  *Fourth*, Dr. Goldstein's unreliable methodology has been rejected by experts in the field.  *Finally*, Dr. Goldstein has made no effort to assess the error rate for his methodology.  These failures illustrate that Dr. Goldstein falls far short of the Supreme Court and Seventh Circuit's standards for expert testimony.  Consequently, this Court should exclude his report and testimony in their entirety before ruling on plaintiffs' motion for class certification.

### A.    Dr. Goldstein's Opinion Is Pure Speculation.

Dr. Goldstein's entire opinion is premised on an unsupported theory—a methodology that he has never made any attempt to carry out and that has never been tested in any way. Dr. Goldstein admitted five times that he has not actually implemented any portion of his proposed methodology (Goldstein Dep. 9, 11, 98, 127, 156–57), and admitted nineteen times that he does not know whether it is *even possible* to implement his proposed methodology (*id.* at 9– 10, 73–74, 82–84, 87–89, 98–100, 105, 107, 113, 116, 131, 160–61).  This falls woefully short of *Daubert*'s standards.  Experts are required to have "analytically sound bases for their opinions"; "the whole point of *Daubert* is that experts can't speculate." *DePaepe v. Gen. Motors Corp.*, 141 F.3d 715, 720 (7th Cir. 1998) (internal quotation marks omitted).  This is sufficient grounds on its own to exclude Dr. Goldstein.

Indeed, in *Clark v. Takata Corp.*, the Court excluded a proposed expert's testimony because his opinion was based "solely on his belief and assumption without any scientific testing

data or supporting research material in the record." 192 F.3d 750, 758 (7th Cir. 1999).  The court

based this conclusion on the following exchange from the expert's deposition:

> Q.  And what testing or data base do you rely upon in offering that opinion?
>
> A.  My experience.
>
> Q.  Is that it?
>
> A.  That's it.  [*Id.*]

Since the expert's opinion was "connected to existing data only by the *ipse dixit*, or bare

assertion, of the expert," the court found that the expert's opinion was properly excluded.  *Id.*

*See also Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005) (holding

that a witness "who invokes 'my expertise' rather than analytic strategies widely used by

specialists is not an expert as Rule 702 defines the term.").

> Dr. Goldstein's testimony is strikingly similar to the testimony from *Clark*:
>
> Q.  What's the basis of your opinion that it is possible to carry out all of the steps associated with your proposed step 2?[2]
>
> A.  A lot of this is computer-related, and I have a belief, based on working with lots of data from lots of different organizations, that these things can be implemented.
>
> Q.  Do you have any basis for your opinion that it's possible to carry out your proposed Step 2 other than your general background in computer systems?
>
> A.  No.
>
> <div align="center">*      *      *</div>
>
> Q.  What specific expertise did you gain from working with other computer systems that allows you to conclude that it is possible to perform the specific parts of your proposed Step 2?
>
> A.  My general belief that if the data are electronically available, I can get the answer.

---

[2]   The second step of Goldstein's four-step methodology is to determine whether an appeal was submitted and whether the appeal was timely.  (Goldstein Dep. 62–63)

Q.  Anything else?

A.  No.  [Goldstein Dep. 100–101]

The speculative nature of Dr. Goldstein's opinions is unsurprising given the fundamental disconnect between his area of expertise and the subject matter of his opinion in this case. Dr. Goldstein's knowledge of statistics does not authorize him to speculate regarding data extraction or the meaning of Medicaid eligibility data.  *E.g.*, *DL v. District of Columbia*, 730 F. Supp. 2d 78, 80–81 (D. D.C. 2010) (excluding a statistician with "more than 35 years of experience with computers, computer programming and databases" from testifying regarding computer programming); *MDG Int'l, Inc. v. Australian Gold, Inc.*, 2009 WL 1916728, *3 (S.D. Ind. June 29, 2009) (excluding a professor of accounting with "impressive" experience in valuing public companies from testifying regarding the value of a closely held business).

Dr. Goldstein's own testimony demonstrates that his opinions regarding the feasibility of extracting data from Indiana's Medicaid computer systems are pure speculation.

Q.  You're not an expert in any Medicaid eligibility computer system, correct?

A.  Correct.

Q.  You're not an expert in the reporting capabilities of any Medicaid eligibility computer system, correct?

A.  Correct.

Q.  You're not an expert in the data extraction capabilities of any Medicaid eligibility computer system, correct?

A.  Correct.  [Goldstein Dep. 41; *see also id.* at 38 (Dr. Goldstein is not an expert in computer programming)]

In fact, Dr. Goldstein admitted that he has *never even used* any of the systems identified in his report.  (*Id.* at 39–40).  Before this case, Dr. Goldstein had never seen any of the basic ICES screens his analysis is based on.  (*Id.* at 42–43)  He does not have "any information regarding the computer system used by the Office of Hearings and Appeals." (*Id.* at 40–41)

9

Moreover, Dr. Goldstein admitted that any background in computers he might have, has no relevance here:

> Q.  Can you tell me any system you worked with that you believe is close to the Medicaid eligibility system in Indiana?
>
> A.  No.  [*Id.* at 175]

Dr. Goldstein's opinions are irreparably speculative for the separate reason that, by his own admission, he has no reliable basis to interpret appeal requests and caseworker notes.  Even if Dr. Goldstein were able to obtain the necessary data extracts and documents, he would then need to analyze the information contained in those materials to identify potential class members.  (Report 2–5)  For example, Dr. Goldstein's methodology calls for caseworkers' free-form notes (referred to as "CLRC" notes) to be searched, reviewed, and interpreted *in each and every case*.  (Goldstein Dep. 66, 102–03)  Similarly, Dr. Goldstein's proposed methodology repeatedly calls for the review and interpretation of appeal documents such as appeal requests.  (*E.g.*, *id.* at 84–85, 98, 158; *see also id.* at 74 (admitting that the data underlying the HERQ (hearing request) screen in ICES "is neither complete nor accurate enough to determine whether an appeal was filed in any given case"), 80 (admitting that "[t]he only way to verify whether an appeal request actually relates to a Medicaid termination action is to review the appeal request itself"))

But any attempt by Dr. Goldstein to carry out these parts of his methodology would constitute sheer speculation:

> Q.  Are you qualified to review and interpret appeal request documents?
>
> . . .
>
> A.  No.

<div align="center">*      *      *</div>

> Q.  Are you qualified to read and interpret the meaning of CLRC notes?

A.  No.  [*Id.* at 86, 94; *see also id.* at 42 (Dr. Goldstein had never even seen CLRC notes before this case and is "not a Medicaid expert")]

Dr. Goldstein's assumption, based on his general experience with computers, that his methodology can be implemented is exactly the type of speculation that *Daubert* aimed to eliminate.  Thus, Dr. Goldstein's opinion should be excluded.

**B.      Dr. Goldstein Is Merely Parroting The Opinions Of Plaintiffs' Counsel.**

Courts have repeatedly excluded opinions that merely regurgitate information and conclusions provided by a party.  *See, e.g., King-Indiana Forge, Inc. v. Millennium Forge, Inc.*, 2009 WL 3187685, *2 (S.D. Ind. Sept. 20, 2009) (excluding an accountant with 30 years of experience who had received awards from the Indiana CPA Society, because he "simply offered [plaintiff's] conclusions as his own"); *MDG Int'l, Inc. v. Australian Gold, Inc.*, 2009 WL 1916728, *5 (S.D. Ind. June 29, 2009) (excluding an expert who took plaintiffs' representations "at face value" and incorporated them into his analysis).  Dr. Goldstein fails this test as well.

In this case, Dr. Goldstein proposes a four-step analysis.  (Goldstein Dep. 67)  But one entire step (step 3) was drafted exclusively by plaintiffs' counsel:

Q.  And all of the parts of your proposed Step 3 were prepared by plaintiffs' counsel, correct?

A.  Yes.  [*Id.* at 103]

This third step is critical, as it attempts to filter out individuals with so-called "exceptional circumstances" who are not entitled to class membership.  (Report 4; Goldstein Dep. 63–67; *see also id.* at 64 (plaintiffs' counsel instructed Goldstein that it was a "good idea" to exclude beneficiaries who were not entitled to continuing benefits:  "they said [ ] these cases would not be damaged, so they should be excluded"))  This step must be performed in each and every case in order to implement Dr. Goldstein's proposed methodology.  (Goldstein Dep. 67)

11

Dr. Goldstein openly admitted, "I don't yet know all possible exceptional circumstances" (Report 4; *see also* Goldstein Dep. 103:23–104:3); he was relying on plaintiffs' counsel for that. Plaintiffs' counsel confirmed this reality by objecting on *foundation* grounds when Dr. Goldstein was asked whether his methodology accounts for all of the circumstances of ineligibility for continuing benefits. (*Id.* at 104:4–11) While Dr. Goldstein's proposed step 3 purports to apply a methodology to account for some of these circumstances, the fact that plaintiffs' counsel wrote this portion of the methodology illustrates that Dr. Goldstein does not have *any* opinion on how to implement a methodology that that could account for such exceptions. Nor did Dr. Goldstein apply any *expertise* to formulate an opinion based on the information provided by plaintiffs' counsel. And without this step, Dr. Goldstein's methodology fails.

Not only does Dr. Goldstein parrot the hypotheses of plaintiffs' counsel, he cannot even carry out his methodology without asking the plaintiffs' lawyers for instructions. When asked how he would handle simple situations, Dr. Goldstein couldn't provide an answer—he would need to ask plaintiffs' counsel how to apply his proposed methodology to those cases:

> Q.  How would you handle a case where the CLRC notes indicates that the father appealed but are silent regarding whether the appeal covers his son?
>
> . . .
>
> A.  I would probably have to speak to my clients about how this should be handled, what group this person belongs -- these people belong in.

<div align="center">*      *      *</div>

> Q.  How would you handle a case where the CLRC notes indicates that the client submitted a written appeal, but are silent regarding whether the appeal was for Medicaid, food stamps, or TANF?
>
> . . .
>
> A.  There may be other things in the data that would tell me what's going on. But again, this is an issue that I would probably have to take up with my clients and flag as a special case.

<div align="center">12</div>

*     *     *

Q.  Who are your clients?

A.  Severns & Stinson.

Q.  The plaintiffs' lawyers?

A.  Yes.  [Goldstein Dep. 157, 159, 163–164]

Dr. Goldstein's inability to apply his own methodology demonstrates that Dr. Goldstein's opinions cannot be separated from those of plaintiffs' counsel.  *See, e.g.*, *id.* at 18:9–12 ("Q. Have you conducted any original analysis in this case? . . .  THE WITNESS.   No.") Dr. Goldstein's methodology simply cannot be considered reliable if he has to ask plaintiffs' counsel how to do it.  This is exactly the type of regurgitation that courts routinely exclude.

### C.    Dr. Goldstein's Methodology Is Not Based On Sufficient Facts Or Data Because He Failed To Review Key, Fundamental Materials In This Case.

Because Dr. Goldstein has never used or reviewed *any* of the relevant Medicaid computer systems (or any system that is even "close" to them), any opinion Dr. Goldstein gives on the capabilities of those systems is unreliable. To offer a reliable opinion on software, "an expert should, at a minimum, examine the product and software upon which the expert bases his opinion." *Autotech Tech. Ltd. P'ship v. AutomationDirect.com*, 471 F.3d 745, 749 (7th Cir. 2006).  In *Autotech*, although the expert had 26 years of experience in software development and reviewed advertisements about C-More, the expert "never conducted tests on the product."  *Id.* The court excluded the expert because he had failed to examine the actual program that was the subject of his opinion; reviewing advertisements fell far short of *Daubert*'s standards.  *Id.  See also Arista Records, LLC v. Usenet.com, Inc.*, 608 F. Supp. 2d 409, 424–27 (S.D. N.Y. 2009) (excluding an expert who had reviewed the software's operations manual, conducted internet

13

research, and read the defendant's notes regarding the software, but had "conducted no independent analysis" that would allow him to understand the data in the software itself).

Dr. Goldstein's effort in this case is even more meager than that undertaken in *Autotech* and *Arista*. Although he seeks to opine regarding the data extraction capabilities of Indiana's Medicaid computer systems (ICES, WFMS/FACTS, and the Office of Hearings and Appeals' System), Dr. Goldstein failed to review *any* of those systems (Goldstein Dep. 40), and has not reviewed a single data extract from any of them (*id.* at 142). Dr. Goldstein's only interaction with these systems was to review a handful of paper PDFs given to him by plaintiffs' counsel. (*Id.* at 42–43, 177–78) He has seen a total of one HERQ (hearing request) screen and three CLRC (free-form caseworker notes) entries. (*Id.* at 92; Report 6) And for some systems and databases, he hasn't even seen a screenshot; he is literally shooting in the dark:

Q. Have you ever seen the SMUM database?

A. No.

Q. Have you ever seen a screen shot of the SMUM database?

A. No.

\*       \*       \*

Q. Have you ever used the computer system employed at the Office of Hearings and Appeals?

A. No.

Q. Do you know what kind of computer system is used by the Office of Hearings and Appeals?

A. No.

Q. Do you have any information at all regarding the computer system used by the Office of Hearings and Appeals?

A. No. [Goldstein Dep. 40–41, 43]

14

Dr. Goldstein cannot possibly give a reliable expert opinion on how to use any of Indiana's Medicaid databases to identify class members.

Moreover, Dr. Goldstein has not reviewed basic Medicaid materials squarely on point. For example, the Indiana Program Policy Manual (IPPM) and Indiana Eligibility Procedures Manual (IEPM) contain the State's policies regarding appeals and continuation of benefits for Medicaid.  (Ex. D, Sanford Dep. 10–14).  But Dr. Goldstein only spent "a few minutes" reviewing these key materials and did not review *any* of the any specific policies or instructions from these manuals.  (Goldstein Dep. 144–45) Similarly, although Dr. Goldstein's methodology is meant to filter out cases in which a beneficiary who filed a timely appeal was nonetheless *not* entitled to continuing benefits (*id.* at 63–64), Dr. Goldstein did not review *any* depositions of FSSA employees, many of which identify exactly these circumstances (*id.* at 142–43; *see also, e.g.*, H, Stamper Dep. 28–29; Sanford Dep. 98–99).

### D.   Dr. Goldstein's Proposed Methodology Has Been Rejected By Experts In The Field.

When a proposed expert fails to use methods that are generally accepted in the relevant scientific community, the expert should be excluded.  *E.g.*, *Frymire-Brinati v. KPMG Peat Marwick,* 2 F.3d 183, 186 (7th Cir. 1993) (reversing a district court's decision to admit testimony from an accountant about land valuation because he failed to "employ the methodology that experts in valuation find essential"); *Rodefer v. Hill's Pet Nutrition, Inc.*, 2003 WL 23096486, *6 (S.D. Ind. Nov. 7, 2003) (excluding expert testimony because the expert's methodology was "far from being generally accepted" among the relevant scientific community).

Plaintiffs have not identified a shred of evidence that Dr. Goldstein's methodology is generally accepted among Medicaid computer systems experts.  In fact, third-party witnesses in this case who Dr. Goldstein recognizes as possessing "substantial experience and expertise in the

Indiana Medicaid eligibility systems" (Goldstein Dep. 147, 149) have explicitly *rejected* his proposed methodology, testifying that identifying individuals who were eligible for continuing benefits pending an appeal but did not receive them requires subjective, case-by-case review and cannot be done by using data extracts or reports.

<div align="center">Redacted</div>

Dr. Goldstein acknowledged that Reyes is a true expert in this field:

> Q.  You also rely on the deposition of Mr. Joseph Reyes; is that right?
>
> A.  Yes.
>
> Q.  Do you recognize that Mr. Reyes has substantial experience and expertise in the Indiana eligibility computer systems, including ICES and FACTS; is that correct?
>
> A.  Yes.
>
> Q.  You recognize that Mr. Reyes has substantial experience and expertise in the analysis necessary to determine whether an individual was entitled to continuing benefits but did not receive them, correct?
>
> A.  Yes.
>
> Q.  Mr. Reyes has more experience and expertise in the ICES and FACTS systems than you do, correct?
>
> A.  Yes.
>
> Q.  Mr. Reyes has more experience and expertise in the analysis necessary to determine whether Medicaid beneficiaries were entitled to continuing benefits but did not receive them than you do, correct?
>
> A.  Yes.  [Goldstein Dep. 149–50]

<div align="center">16</div>

Redacted

Redacted

Redacted                                    Dr. Goldstein admitted that "Mr. Perez

has far more experience and expertise in the ICES system" than he does, and that he "fully

defer[s] to Mr. Perez on the ICES system, how it's set up, [and] what extracts can or cannot be

created." (Goldstein Dep. 148–49)

---

3  Redacted

Redacted

In other words, the only way to reliably determine who and what an appeal covers is to review

the appeal document itself.

> Dr. Goldstein, on the other hand, assumes the exact opposite:

> Q.   You're assuming that all of the data elements required to perform your proposed methodology can be extracted from ICES and other relevant computer systems and linked to a particular termination action, correct?

> A.   Yes.  [Goldstein Dep. 162]

Dr. Goldstein admitted, however, that this assumption is pure speculation; he could not identify

*any* data extract that links an appeal request to a particular termination action:

> Q.   The only way to verify whether an appeal request actually relates to a Medicaid termination action is to review the appeal request itself, correct?

> A.  I can't think of another way, offhand.

> Q.  You're not aware of any data extract or report that could automatically link an appeal request to any particular termination action, correct?

> A.  Correct.  [Goldstein Dep. 80:19–81:4]

Redacted

Redacted

Dr. Goldstein's simplistic methodology has been explicitly refuted by knowledgeable third-party witnesses *upon whom Dr. Goldstein admittedly relies*.  All three of these third-party witnesses possessed substantial experience and expertise in Indiana's Medicaid computer systems.  And all three agreed that using data extracts is not a reliable methodology for identifying potential class members.  Because Dr. Goldstein's methodology has not been accepted by any expert in the field—to say the least—his opinions should be excluded.

**E.      Dr. Goldstein has made no effort to assess the error rate of his untested methodology.**

*Daubert* itself held that an important factor in assessing the reliability of a proposed methodology is the known or potential rate of error for that methodology.  509 U.S. 579, 594 (1993).  In fact, "[w]hether an expert has subjected his theory to testing has been recognized as the most important reliability factor."  *Chapman v. Maytag Corp.*, 297 F.3d 682, 688 (7th Cir. 2002).  Thus, courts routinely exclude experts who fail to conduct *any* tests to identify the error rate of their methodologies.  *See, e.g.*, *Rodefer*, 2003 WL 23096486 at *6 n.4; *Mohney v. USA Hockey, Inc.*, 300 F. Supp. 2d 556, 571 (N.D. Ohio 2004).

Redacted

. . .

Redacted

On multiple occasions, Dr. Goldstein agreed that his proposed data extracts would likely contain errors.  (*E.g.*, Goldstein Dep. 92, 165–66, 170–71, 173)  Dr. Goldstein was repeatedly asked whether he had evaluated the potential error rates of his proposed methodology, and he admitted at least nine times that he had not.  (*Id.* at 16, 72, 90, 99, 115, 133, 173)  In fact, Dr. Goldstein admitted that he has not tested his methodology a single time.  (*Id.* at 10, 16)  The potential error rate of his proposed methodology is completely unknown:

> Q.  So you can't, as you sit here today, even give us some idea as to the percentage of errors there may be in the methodology you're going to follow?
>
> A.  Correct.
>
> Q.  But you do know there's going to be some?
>
> A.  Yes.  [*Id.* at 173]

Because Dr. Goldstein has made no effort to test the error rate of his proposed methodology, the court cannot determine the reliability of that methodology, and his opinions should be excluded.

## CONCLUSION

For the foregoing reasons, defendants respectfully request that the Court exclude the report and testimony of Dr. Goldstein before considering plaintiffs' motion for class certification.


Dated:  August 17, 2012

Respectfully submitted,

*s/ Melanie E. Harris*
L. Alan Whaley (#1799-49)
Michael A. Wukmer (#2223-49)
Judy S. Okenfuss (#16157-49)
Melanie E. Harris (#22994-49)
Jenny R. Buchheit  (#26653-49A)
ICE MILLER LLP
One America Square, Suite 2900
Indianapolis, Indiana 46282-0200

*Attorneys for Defendant ACS Human Services*


*s/ John B. Drummy*
John B. Drummy
Michael Wroblewski
Robert M. Kelso
KIGHTLINGER & GRAY, LLP
Market Square Center, Suite 600
151 North Delaware Street
Indianapolis, Indiana 46204

*Attorneys for Defendant Arbor E&T, LLC*

*s/ Zachary D. Holmstead*
Andrew W. Hull (#11218-49)
Jason L. Fulk (#24890-53)
HOOVER HULL LLP
111 Monument Circle, Suite 4400
Indianapolis, IN 46244-0989

Steven D. McCormick, P.C.
Anne M. Sidrys, P.C.
Martin L. Roth
Zachary D. Holmstead
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois  60654

*Attorneys for Defendant International
Business Machines Corporation*


*s/ John F. Ittenbach*
Robert M. Koeller
John F. Ittenbach
ITTENBACH JOHNSON TRETTIN &
KOELLER
6350 North Shadeland, Suite 4
Indianapolis, IN  46220

*Attorneys for Defendant Phoenix Data
Corporation*

**CERTIFICATE OF SERVICE**

I certify that the foregoing document was filed electronically on August 17, 2012.  Notice of this filing will be sent to all counsel of record via an automatic e-mail message generated by the CM/ECF system.

<div style="text-align: right">

*s/ Zachary D. Holmstead*
Zachary D. Holmstead

</div>