UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

JAMES BOWMAN, as next friend for )
J.B., and MELISSA GIBSON, as next )
friend for COURTNEY ANDERSON, on )
behalf of themselves and others similarly )
situated, )
            Plaintiffs, )
             )    1:11-cv-0593 RLY-TAB
             )
      *vs.* )
             )
INTERNATIONAL BUSINESS )
MACHINES CORPORATION, ACS )
HUMAN SERVICES, LLC, PHOENIX )
DATA CORPORATION and ARBOR )
E&T, LLC, )
         Defendants. )

**UNDER SEAL: ENTRY ON DEFENDANTS' MOTION TO EXCLUDE
DR. RICHARD GOLDSTEIN**

    This matter arises out of a putative class action involving Medicaid recipients who

received a notice that their benefits would be terminated and appealed their termination in

a timely manner; their benefits, however, were interrupted or not continued pending a fair

hearing of their appeal.  In support of their motion for class certification, Plaintiffs

submitted a report and testimony from Dr. Richard Goldstein.  Defendants now move to

exclude Dr. Goldstein's opinions.  For the reasons set forth below, the court **GRANTS**

Defendants' motion.

I.      **Background**[1]

The Family and Social Services Administration ("FSSA") of the State of Indiana administers the State's Medicaid program.  (Complaint ¶ 4).  In December 2006, International Business Machines Corporation ("IBM") entered into a Master Services Agreement (the "MSA") with the FSSA and assumed the overall management of the eligibility determination process.  (*Id.* at ¶¶ 6-7).  IBM then delegated to other contractors most of the day-to-day responsibilities of working with beneficiaries to determine their eligibility and process their appeals.  (*Id.* at ¶ 7).

In March 2009, the State of Indiana (on behalf of the FSSA) notified IBM that its performance in managing the functions critical to eligibility determinations through its subcontractors was grossly deficient.  (*Id.* ¶ 16).  Accordingly, the State terminated the MSA with IBM seven years before its expiration, and the parties have sued each other over the legalities of the termination.  (*Id.*).

On June 8, 2012, Plaintiffs moved to certify the following class:

> [A]ll Medicaid recipients in the State of Indiana who timely requested a fair hearing to contest the termination of their benefits, but whose benefits were nonetheless terminated before a fair hearing was held and a ruling was issued.

(Docket # 203).  In support of this motion, Plaintiffs submitted the expert report of Dr. Richard Goldstein to establish that the proposed class is ascertainable and identifiable. *See Oshana v. Coca-Cola Co*., 472 F.3d 506, 513 (7th Cir. 2006) (finding that in addition

---

[1] The following is an abridged version of the alleged facts in this case.  A more detailed summary is set forth in *Bowman v. Int'l Bus. Machines Corp.,* 853 F. Supp. 2d 766 (S.D. Ind. 2012).

2

to satisfying the Rule 23 requirements for class certification, a plaintiff must also show "that the class is indeed identifiable as a class").  This report focused on the ability to use "relevant electronic databases" to determine instances where recipients were subject to discontinuances or interruptions in their Medicaid coverage despite their timely appeal. (Goldstein Report 1).  Dr. Goldstein proposed a four-step test which, in short, uses various computerized systems of data[2] to: (1) identify instances of terminations and the effective date of the termination action that led to the termination (ICES); (2) determine in which instances an appeal request was received before the effective date associated with the termination action (ICES, WFMS/FACTS, Hearings and Appeals, and CLRC case notes); (3) identify exceptional circumstances which would exclude class members (CLRC case notes and ICES); and (4) calculate the duration of the deprivation of Medicaid benefits for each incident that has not been excluded (ICES).  (*Id*. at 2-5).  Each of these steps requires at least one extract from these computerized systems.  Dr. Goldstein concluded that by using these different computerized systems of data, "a reliable method existed for identifying instances where Indiana Medicaid recipients were subject to discontinuances or interruptions in their Medicaid coverage, despite the fact

---

[2] Dr. Goldstein's report includes a brief description of each computer system he includes in his proposed methodology.  ICES is a "system of databases that includes information about recipients of Medicaid in Indiana from their original application to either their termination from Medicaid or to the current date."  (Goldstein Report 1).  WFMS/FACTS (FACTS is the current name while WFMS is the former) is a work flow management system that "tracks both documents and tasks related to a case, including appeal requests and tasks related to appeals processing."  (*Id*. at 2).  Lastly, the Office of Hearings and Appeals maintains a database of appeals, "from which appeal requests received by the agency can be identified."  (*Id*.).  In addition, Dr. Goldstein testified that CLRC notes are "case note narratives that . . . are written by caseworkers" and may include shorthand notes, abbreviations, and acronyms.  (Goldstein Dep. 90:19-21, 92:11-13).

that they had timely requested a fair hearing."  (*Id*. at 5).  Defendants now move to exclude Dr. Goldstein's opinions.

As a preliminary matter, it is proper to decide this motion prior to a determination for class certification.  If an expert's report or testimony is "critical to class certification," a district court must make a conclusive ruling on any challenge to that expert's qualifications or submissions before it may rule on a motion for class certification. *American Honda Motor Co. v. Allen*, 600 F.3d 813, 815-16 (7th Cir. 2010).  Here, Dr. Goldstein provides the only methodology for identifying potential class members.  As noted above, this issue is critical in deciding class certification; thus, the court turns to it now.[3]

## II.   Discussion

### A.  Rule 702

Although a federal court exercising diversity jurisdiction must apply state law to substantive issues, the admissibility of expert testimony in diversity suits is governed by the Federal Rules of Evidence.  *Stutzman v. CRST, Inc*., 997 F.2d 291, 295 (7th Cir. 1993).  Specifically, Rule 702 of the Federal Rules of Evidence ("Rule 702") and the principles set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579 (1993), govern the admissibility of expert testimony.  *Smith v. Ford Motor Co.*, 215 F.3d 713, 717-18 (7th Cir. 2000).  Rule 702 states:

---

[3] Plaintiffs attached a "reply report" from Dr. Goldstein to their response.  Defendants filed a motion to strike this report as untimely and containing improper rebuttal.  Magistrate Judge Baker issued an Order granting Defendants' motion to strike.  (Docket # 284).  Plaintiffs filed objections to this Order, but this court overruled those objections.  (Docket # 301).  Accordingly, Dr. Goldstein's reply report has not been considered for this motion.

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702.  At bottom, the court must ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  *Daubert*, 509 U.S. at 597.

The Seventh Circuit has set forth a three-step analysis for determining whether expert testimony is both relevant and reliable: (1) the witness must be qualified as an expert by knowledge, skill, experience, training, or education; (2) the expert's reasoning or methodology underlying the testimony must be scientifically reliable; and (3) the testimony must assist the trier of fact to understand the evidence or determine a fact in issue. *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007) (citations and internal quotations omitted).  Here, Defendants challenge the reliability of Dr. Goldstein's report and testimony but do not contest its relevancy.  Thus, the court will focus on his qualifications and the methodology he used.

### 1.  Qualifications

An expert may be qualified by "knowledge, skill, experience, training, or education."  FED. R. EVID. 702.  Although "extensive academic and practical expertise" in an area is certainly sufficient to qualify a potential witness as an expert, "Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is

based on experience." *Smith*, 215 F.3d at 718 (citations omitted).  Thus, "a court should consider an expert's full range of practical experience as well as academic or technical training when determining whether the expert is qualified to render an opinion in a given area." *Id*.  A witness is qualified as an expert if the area in which the witness has superior knowledge, skill, experience, or education is relevant to the subject matter of the witness's testimony.  *Jones v. Lincoln Elec. Co*., 188 F.3d 709, 723 (7th Cir. 1999).

Here, Dr. Goldstein has been a statistical consultant since 1979 and was named a Fellow of the American Statistical Association in 2002.  (Goldstein Report 1).  In his work as a consultant to various government agencies and to various companies, Dr. Goldstein has "written proposals, designed research, designed data collection instruments and procedures, designed and performed statistical analyses and written reports."  (*Id*. at Ex. A).  Plaintiffs further contend – without any citation to evidence – that in Dr. Goldstein's work as a statistician, he "routinely uses computer systems as part of his statistical work, and he has specific experience on which he draws to analyze electronic data."

Defendants present three arguments attacking Dr. Goldstein's qualifications: (1) his lack of relevant expertise; (2) his failure to review relevant materials; and (3) Plaintiffs' counsel's assistance in creating the proposed methodology.  The court now evaluates these arguments.

### a.  Lack of Relevant Expertise

Defendants list a litany of areas related to Medicaid eligibility computer systems in which Dr. Goldstein admitted he has little, if any, knowledge.  (*See* Deposition of

Richard Goldstein ("Goldstein Dep.") 39:15-41:4, 175:8-11 (not an expert in, nor has he ever worked with, any of the Medicaid eligibility computer systems such as COBOL, ICES, WFMS, or FACTS); *id*. at 41:9-12 (not an expert in the data extraction capabilities of any Medicaid eligibility computer system); *id*. at 41:5-8 (not an expert in the reporting capabilities of any Medicaid eligibility computer system); *id*. at 175:19-177:5 (no experience with any computer system that is "close" to any of Indiana's Medicaid computer systems); *id*. at 40:22- 41:1 (no experience or any information about the computer system used by the Office of Hearings and Appeals)).  Moreover, Dr. Goldstein admitted a lack of expertise in topics generally relating to Medicaid as well.  (*See id*. 86:7-11 (not qualified to review and interpret appeal request documents); *id*. at 94:11-13 (not qualified to read or interpret CLRC notes); *id*. at 103:23-104:3 (not aware of all the circumstances in which a beneficiary who files a timely appeal is nonetheless ineligible for continuing benefits)).

Plaintiffs respond that Defendants have not identified how Medicaid computer systems run any differently than non-Medicaid systems.  Thus, according to Plaintiffs, because Dr. Goldstein is a statistician who regularly extracts data from varying computer databases using a wide range of computer programming languages, including COBOL, he does not need to show particular competency concerning the databases at issue to give a reliable opinion.

As an initial matter, the mere fact that Dr. Goldstein is a statistician who routinely uses computer systems does not render him qualified to testify as an expert on any subject involving data and computer systems.  *See MDG Int'l, Inc. v. Australian Gold,*

*Inc.*, No. 1:07-cv-1096, 2009 WL 1916728, at *3 (S.D. Ind. June 29, 2009) (finding that even though professor had extensive experience valuing public companies, he lacked expertise and experience to qualify as an expert in area of valuing closely held businesses); *Cunningham v. Masterwear, Inc.,* No. 1:04-cv-1616, 2007 WL 1164832, at *10 (S.D. Ind. Apr. 19, 2007) (stating that just because proposed experts were medical doctors "does not automatically give them the right to opine on all medically-related subjects in a court of law").  Indeed, Dr. Goldstein's lack of knowledge with these particular systems is evidenced by Dr. Goldstein's assumption that linking between systems was possible, a theory rejected by James Perez -- an employee of Deloitte Consulting who has worked with ICES since 1997.  (*Compare* Goldstein Dep. 162:1-6 (testifying that he assumes all of the data elements in his proposed methodology can be extracted from ICES and linked to a particular termination action), *with* Deposition of James Perez ("Perez Dep.") 80:20-25 (testifying that "there's not a direct link on our system between the appeal and the actions that cause this")).  Even Plaintiffs' claim that Dr. Goldstein has experience with COBOL carries little weight, as Dr. Goldstein admitted that (1) he has never used a COBOL computer system; (2) he has never programmed a COBOL computer system; and (3) he has never written a program to recreate a data extract or report from a COBOL computer system.  (Goldstein Dep. 39:18-40:2).  Moreover, Plaintiffs have not disputed Dr. Goldstein's lack of experience relevant to Indiana's other, non-COBOL systems.

Although "Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience," Dr. Goldstein's experience with the

relevant computer programs is admittedly lacking.  *Walker v. Soo Line R. Co*., 208 F.3d

581, 591 (7th Cir. 2000) (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152

(1999)).  When comparing Dr. Goldstein's proposed expertise as a statistician to the

subject matter of his testimony – conducting data extracts from computer programs with

which he has very little, if any, experience – it is hard to consider Dr. Goldstein suitable

to testify on this subject.  *But see Holtzman v. Turza*, No. 08 C 2014, 2009 WL 3334909,

at *3 (N.D. Ill. Oct. 14, 2009) (finding expert in computer systems and fax transmission

software credible and reliable even though he did not have experience with program used

because his task involved analyzing the data, not the method it had been generated).

Nevertheless, the court will examine other factors set forth in *Daubert* and Rule 702, as

even "shaky expert testimony may be admissible, assailable by its opponents through

cross-examination."  *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 762 (7th Cir.

2010).

### b. Failure to Review Materials

Next, Defendants question Dr. Goldstein's failure to review fundamental materials

to the case, including data extracts from the relevant computer systems or the Medicaid

policies concerning appeals and the continuation of benefits.  (*See* Goldstein Dep. 144-

45); *see also Walker*, 208 F.3d at 590-91 (stating "shoddy preparation by an expert might

evidence a lack of professional qualifications on the part of a proffered witness").

Though Dr. Goldstein's opinions can no doubt be assailed for lack of relevant

background research, this topic is more likely to be covered by vigorous cross-

examination.  *Lock Realty Corp. IX v. U.S. Health, L.P*., No. 3:06-cv-487, 2009 WL

2970330, at *10 (N.D. Ind. Sept. 14, 2009) (finding expert witness qualified to give opinion on the valuation of a nursing home despite lack of knowledge of the health care industry because "concerns relating to her qualifications are better addressed on cross-examination"); *but see Autotech Tech. Ltd. P'ship v. Automationdirect.com*, 471 F.3d 745, 749 (7th Cir. 2006) (upholding district court ruling that expert not qualified where proposed expert on software did not examine the product and software upon which the expert based his opinion).  Thus, this alone does not merit exclusion.

### c. Plaintiffs' Counsel's Assistance

Defendants argue that key portions of Dr. Goldstein's methodology were "prepared" by Plaintiffs' counsel.  This argument focuses on the third step, which involves filtering out individuals from the proposed class who had exceptional circumstances that prevented them from receiving continuing benefits.  Defendants point to Dr. Goldstein's lack of knowledge for all the circumstances in which a beneficiary who files a timely appeal is nonetheless ineligible for continuing benefits.  (*See* Goldstein Dep. 103:23-104:3).  Further, Defendants reference Dr. Goldstein being unable to determine whether his methodology would include or exclude a particular hypothetical without the help of the Plaintiffs' attorneys.  (*See id*. at 157:14-22, 159:4-14, 163:4-164:3).

Dr. Goldstein admittedly lacks expert knowledge as to Medicaid eligibility, but this is not fatal to his testimony.  Dr. Goldstein does not present himself as an expert in Medicaid eligibility; instead, he is proffered as a statistician with knowledge of computer programs and data extraction.  Dr. Goldstein is not merely regurgitating Plaintiffs'

counsel's analysis; instead, he is incorporating their knowledge of the Medicaid system into his own methodology. *But see King-Indiana Forge, Inc. v. Millennium Forge, Inc.*, No. 1:07-cv-00341, 2009 WL 3187685, at *2 (S.D. Ind. Sept. 29, 2009) (excluding expert report on damages where expert failed to independently verify figures cited by plaintiff's employee; instead, he based his opinion solely on the cost recited by plaintiff's employee). Accordingly, this factor does not weigh heavily against his testimony.

In sum, Dr. Goldstein's lack of knowledge concerning the relevant computer systems used to create the proposed class combined with his overall lack of knowledge about the Medicaid system is quite concerning for an expert witness who proposes to testify how such systems can be used to identify individuals who qualify for continuing benefits under Medicaid. *But see Allstate Ins. Co. v. Maytag Corp.*, No. 98 C 1462, 1999 WL 203349, at *3 (N.D. Ill. Mar. 30, 1999) ("Questions about the qualifications of an expert witness should be considered in assessing the credibility and weight of the opinions offered, and should not serve to exclude them altogether"). Although Dr. Goldstein's testimony could potentially be stricken due to his qualifications, the court now turns to his methodology which presents a clearer picture of why his testimony must be excluded.

### 2.    Methodology

Even assuming that Dr. Goldstein is qualified as an expert for these purposes – which the court has not conceded – he "cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method." *Smith*, 215 F.3d at 718. Indeed, an "expert['s] work is admissible only to the extent it is

11

reasoned, uses the methods of the discipline, and is founded on data.  Talking off the cuff

– deploying neither data nor analysis – is not an acceptable methodology." *Lang v.*

*Kohl's Food Stores, Inc*., 217 F.3d 919, 924 (7th Cir. 2000) (citations omitted); *see also*

*Comer v. Am. Elec. Power*, 63 F. Supp. 2d 927, 933 (N.D. Ind. 1999) (stating the court

must "rule out subjective belief and speculation").  In other words, the court must

determine whether it is grounded in the methods and procedures of science and whether

such testimony has sufficient factual underpinnings.  *Bourelle v. Crown Equip. Corp*.,

220 F.3d 532, 536 (7th Cir. 2000).  To that end, *Daubert's* gatekeeping requirement "is to

make certain that an expert, whether basing testimony upon professional studies or

personal experience, employs in the courtroom the same level of intellectual rigor that

characterizes the practice of an expert in the relevant field."  *Kumho*, 526 U.S. at 152.

The court uses the following factors expounded in *Daubert* in assessing an expert's

methodology:

> (1) Whether a theory or technique can be (and has been) tested; (2)
> whether the theory or technique has been subjected to peer review
> and publication; (3) the known or potential rate of error; (4) the
> existence and maintenance of standards controlling the technique's
> operation; and (5) whether the technique or method has been met
> with general acceptance.

509 U.S. at 593-94.

This standard applies to "all expert testimony, whether it relates to an area of

traditional scientific competence or whether it is founded on engineering principles or

other technical or specialized expertise."  *Smith*, 215 F.3d at 719.  That said, this is not a

definitive checklist, as the court is "free to fashion an approach more precisely tailored to

an evaluation of the particular evidentiary submission before it." *United States v. Conn*, 297 F.3d 548, 556 (7th Cir. 2002); *see also Kumho*, 526 U.S. at 141 (stating "the test of reliability is 'flexible,' and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case"). Lastly, in making this evaluation, the court must focus "solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595; *see also Smith*, 215 F.3d at 718 (explaining that the "soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact").

Defendants make three principal arguments against Dr. Goldstein's methodology: (1) his opinions are based on pure speculation; (2) the absence of an error rate merits exclusion; and (3) his methodology has been rejected by experts in the field.

### a.  Opinions Based on Speculation

Defendants' central, and most persuasive, argument for excluding Dr. Goldstein's report is that it is based purely on speculation. Pursuant to Rule 702, "an expert must substantiate his opinion; providing only an ultimate conclusion with no analysis is meaningless." *Huey v. United Parcel Serv., Inc*., 165 F.3d 1084, 1087 (7th Cir. 1999) (citation omitted); *Clark v. Takata Corp*., 192 F.3d 750, 759 (7th Cir. 1999) ("Where the proffered expert offers nothing more than a 'bottom line' conclusion, he does not assist the trier of fact") (citation omitted)); *Kenosha Liquor Co. v. Heublein, Inc*., 895 F.2d 418, 420 (7th Cir. 1990) ("Expert opinions are worthless without data and reasons"). Such conclusory analysis is not acceptable as an "expert must offer good reason to think that

his approach produces an accurate estimate using professional methods, and this estimate must be testable." *Zenith Electronics Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005). That is, "[s]omeone else using the same data and methods must be able to replicate the result." *Id*. Indeed, reasonable methodology upon which to base an opinion may include either "hands-on testing" or "review of experimental, statistical, or other scientific data generated by others in the field." *Cummins v. Lyle Indus*., 93 F.3d 362, 369 (7th Cir. 1996).

Here, Dr. Goldstein admitted he has neither implemented any portion of his proposed methodology nor does he know whether it is even possible to implement his proposed methodology. (Goldstein Dep. 9:12-19). In fact, Dr. Goldstein has not created any data extracts or data reports and is not aware of any data extracts that provide the data needed to perform his methodology. (*Id*. at 9:9-11, 106:22-107:1). Rather, Dr. Goldstein believes he can carry out his methodology solely because of his general background in computer systems. (*Id*. at 100:10-14). Indeed, his reasoning that his methodology is even possible is based on his belief that "if the data are electronically available, [he] can get the answer." (*Id*. at 101:5-10).

Importantly, Dr. Goldstein does not provide reasons or data supporting his methodology as sound; rather, the court is left with nothing but his *ipse dixit* opinion. Rule 702 and *Daubert* are in place to prevent such "because I say so" expert testimony. *See Zenith*, 395 F.3d at 419 (noting that a "witness who invokes 'my expertise' rather than analytic strategies widely used by specialists is not an expert as Rule 702 defines that term"); *DePaepe v. Gen. Motors Corp*., 141 F.3d 715, 720 (7th Cir. 1998) (finding

14

the district court erred in allowing expert to testify on the motive of a car manufacturer in its car design because he "lacked any scientific basis for an opinion").  Put another way, an expert must provide more than a "bottom line" conclusion that is based "solely on his belief and assumption without any scientific testing data or supporting research material in the record."  *Clark*, 192 F.3d at 758-59 (upholding exclusion of expert testimony where expert conducted no scientific tests and formed opinion solely on his experience). Dr. Goldstein fails to provide such support.

Of course, Plaintiffs claim that his analysis does "not lend itself to 'laboratory testing'" and, accordingly, more flexibility is required in analyzing Dr. Goldstein's "experience-based methodology."  At its core, Plaintiffs argue that Dr. Goldstein's experience is sufficient alone to make his opinion reliable.

First, the fact that Dr. Goldstein relies on experience does not completely altar the analysis; the *Daubert* factors still apply.  *Kumho*, 526 U.S. at 152 (finding "a trial court should consider the specific factors identified in *Daubert* where they are reasonable measures of the reliability of expert testimony").  Indeed, *Daubert* factors remain applicable even where "an expert eschews reliance on any rigorous methodology and instead purports to base his opinion merely on 'experience' or 'training,'" as Dr. Goldstein does here.  *Clark*, 192 F.3d at 758.  Based on these factors, Dr. Goldstein fails to reference any similar analysis or relevant knowledge as to provide any bases for his opinions.

Moreover, to the extent Dr. Goldstein relies on his experience, it does not extend to Medicaid eligibility systems. Thus, Dr. Goldstein speculates that he will be able to

successfully identify class members using systems with which he has neither experience

nor knowledge.  Such conclusory analysis is not sufficient to satisfy the requirements for

Rule 702.  *See Kirstein v. Parks Corp.,* 159 F.3d 1065, 1067 (7th Cir. 1998) (upholding

expert's exclusion despite his "impressive credentials" where he did no testing on the

products at issue, did not provide studies which employed such testing, and offered only

speculation).  As a result, this factor favors exclusion.

### b. Lack of Error Rate

Whether a theory has been subjected to the scientific method is a very significant

*Daubert* factor, but Dr. Goldstein admits that no such analysis has taken place.  *Bradley*

*v. Brown*, 42 F.3d 434, 438 (7th Cir. 1994); (Goldstein Dep. 16:11-22 (testifying that he

did not evaluate the potential error rate of his proposed methodology as a whole or any

part)).  Plaintiffs contend that this type of analysis does not lend itself to laboratory

testing and thus, this factor is not applicable.  The court disagrees.

The purported class is derived from Medicaid recipients living in Indiana.  From

this, a large population set exists in which only certain members qualify for the proposed

class.  By implementing this proposed methodology on a subset of this class, Dr.

Goldstein could have discovered how accurate his methodology was in not only selecting

qualified individuals for the class, but also filtering out any exceptions to eligibility.

Further, Plaintiffs' argument that such analysis was impossible has no merit since

Defendants provided data extracts to Plaintiffs earlier in the case and additional extracts

could have been requested through discovery.  (*See* Defs.' Reply, Ex. I (letter to

Plaintiffs' counsel describing enclosed discs which contained data extracts produced by

16

FSSA)).  Despite this opportunity to test his methodology, Dr. Goldstein relied chiefly on

his own belief that his methodology would work.  This is not sufficient to satisfy Rule

702.  *See Chapman v. Maytag Corp.*, 297 F.3d 682, 688 (7th Cir. 2002) (excluding expert

testimony where the lack of any studies, tests, or experiments to justify or verify the

expert's conclusions led the court to finding opinions as nothing more than "unverified

statements unsupported by scientific methodology").

### c. Rejected by Experts in Field

Finally, Defendants point to the lack of acceptance of Dr. Goldstein's

methodology by experts in the field.  It first must be noted that *Daubert* does not require

"general acceptance" as a necessary precondition to the admissibility of scientific

evidence under the Federal Rules of Evidence.  *Daubert*, 509 U.S. at 597.  Thus, the mere

fact that other experts do not agree with Dr. Goldstein's methodology is not necessarily

fatal.  Moreover, it is not the court's role to decide whether Dr. Goldstein's opinion is

correct, but instead it is limited to determining whether the methodology underlying the

testimony is sound.  *Smith*, 215 F.3d at 719.

Defendants reference several individuals with substantial experience and expertise

in Indiana's Medicaid computer systems who disagree with Dr. Goldstein's analysis.  For

example, Joseph Reyes of First Data Corporation stated that subjective judgment is

required to interpret appeal documents.  (Deposition of Joseph Reyes 165:2-15).  This

undermines Dr. Goldstein's theory that computer-generated extracts and reports alone

may determine class eligibility.  Similarly, Kathleen McCain, a project manager with

First Data Corporation, testified that the only way to identify proposed class members is

17

through a case-by-case analysis of each file.  (Deposition of Kathleen McCain 130:12-132:3).  And finally, James Perez, a program manager with Deloitte Consulting, expressed doubt in drawing meaningful conclusions from data extracts because "there's not a link on our system between the appeal and the actions that cause this."  (Perez Dep. 80:15-25).  On the other hand, Plaintiffs do not cite any studies, data, publications, or peer-reviewed materials that support Dr. Goldstein's proposed methodology.

This criticism does not bode favorably for the reliability of Dr. Goldstein's opinion.  *See Chapman*, 297 F.3d at 688 ("Unsubstantiated testimony . . . does not ensure that expert's opinion has a reliable basis in knowledge and experience in his discipline.").  Although lack of general acceptance – or any acceptance at all – is not a death knell to Dr. Goldstein's opinions, it only reinforces the court's conclusion that Dr. Goldstein's opinions should be excluded.

In sum, Dr. Goldstein's qualifications for the relevant issues here are questionable, but the methodology used by Dr. Goldstein clearly does not satisfy the requirements under Rule 702.  Thus, Dr. Goldstein's report and testimony are excluded.

**III.    Conclusion**

The court finds that Dr. Goldstein's report and testimony are not reliable under the principles set forth in *Daubert* and Rule 702.  Accordingly, Defendants' motion to exclude Dr. Richard Goldstein (Docket # 246) is **GRANTED**.

**SO ORDERED** this 16th day of August 2013.

RICHARD L. YOUNG,  CHIEF JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsel of Record.