UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| JAMES BOWMAN, as next friend for J.B., and MELISSA GIBSON, as next friend for COURTNEY ANDERSON, on behalf of themselves and others similarly situated,<br>          Plaintiffs,<br>     vs.<br>INTERNATIONAL BUSINESS MACHINES CORPORATION, ACS HUMAN SERVICES, LLC, PHOENIX DATA CORPORATION and ARBOR E&T, LLC,<br>          Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)  1:11-cv-0593 RLY-TAB<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**UNDER SEAL: ENTRY ON DEFENDANTS' MOTION TO EXCLUDE
DR. MELISSA THOMASSON**

This matter arises out of a putative class action involving Medicaid recipients who received a notice that their benefits would be terminated and appealed their termination in a timely manner; their benefits, however, were interrupted or not continued pending a fair hearing of their appeal. In support of their motion for class certification, Plaintiffs submitted a report and testimony from Dr. Melissa A. Thomasson. Defendants now move to exclude Dr. Thomasson's opinions. For the reasons set forth below, the court **GRANTS** Defendants' motion.

1

## I. Background[1]

The Family and Social Services Administration ("FSSA") of the State of Indiana administers the State's Medicaid program. (Complaint ¶ 4). In December 2006, International Business Machines Corporation ("IBM") entered into a Master Services Agreement (the "MSA") with the FSSA and assumed the overall management of the eligibility determination process. (*Id.* at ¶¶ 6-7). IBM then delegated to other contractors most of the day-to-day responsibilities of working with beneficiaries to determine their eligibility and process their appeals. (*Id.* at ¶ 7).

In March 2009, the State of Indiana (on behalf of the FSSA) notified IBM that its performance in managing the functions critical to eligibility determinations through its subcontractors was grossly deficient. (*Id.* ¶ 16). Accordingly, the State terminated the MSA with IBM seven years before its expiration, and the parties have sued each other over the legalities of the termination. (*Id.*).

On June 8, 2012, Plaintiffs moved to certify the following class:

> [A]ll Medicaid recipients in the State of Indiana who timely requested a fair hearing to contest the termination of their benefits, but whose benefits were nonetheless terminated before a fair hearing was held and a ruling was issued.

(Docket # 203). In support of this motion, Plaintiffs submitted the expert report of Dr. Melissa Thomasson to determine whether damages could be calculated on a classwide basis. Dr. Thomasson's report focused on "whether it is possible to quantify the

---

[1] The following is an abridged version of the alleged facts in this case. A more detailed summary is set forth in *Bowman v. Int'l Bus. Machines Corp.*, 853 F. Supp. 2d 766 (S.D. Ind. 2012).

2

economic damages resulting from a wrongful termination, using evidence that is common to the class, and if so, to outline the proper methodology." (Thomasson Report 7).

Dr. Thomasson determined that one could evaluate the damage to persons who are deprived of health insurance by "calculating the economic value of the insurance that was wrongfully withheld from the individual." (*Id*. at 8). Dr. Thomasson proposed that this value could be calculated by using data that states are required to report to the federal government, found on Form CMS-64 and the Medicaid Statistical Information System. (*Id*. at 11). Using this information, she determined that economic damages can be quantified on a classwide basis by equating lost Medicaid benefits to lost insurance coverage, and dividing Indiana's total Medicaid expenditures by the total number of Indiana citizens who are eligible for Medicaid. (*Id*. at 12). According to Dr. Thomasson, this quotient would reflect the premium that they would have to pay for their coverage. (*Id*.). This is called an "actuarially fair" premium because each member pays a premium paid equal to the expected value of coverage. (*Id*. at 10).

Using this formula, Dr. Thomasson calculated a range for the annual monetary damages associated with wrongful termination of Medicaid coverage in 2007 through 2010. (*Id*. at 14). Based on this analysis, Dr. Thomasson determined that a valid method exists to quantify economic damages on a non-individualized basis. (*Id*. at 7). Defendants now move to exclude Dr. Thomasson's opinions.

As an initial matter, it is proper to decide this motion prior to a determination for class certification. If an expert's report or testimony is "critical to class certification," a district court must make a conclusive ruling on any challenge to that expert's

3

qualifications or submissions before it may rule on a motion for class certification. *American Honda Motor Co. v. Allen*, 600 F.3d 813, 815-16 (7th Cir. 2010). Here, Dr. Thomasson provides the only basis for Plaintiffs' proposed method of calculating damages on a non-individualized basis. This issue goes to the requirements of Federal Rule of Civil Procedure 23(b)(3), which requires questions of law or fact common to the class members predominate over any questions affecting only individual members. *See Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012). As such, this topic is critical to class certification, and the court turns to it now.[2]

## II.  Discussion

### A.  Rule 702

Although a federal court exercising diversity jurisdiction must apply state law to substantive issues, the admissibility of expert testimony in diversity suits is governed by the Federal Rules of Evidence. *Stutzman v. CRST, Inc.*, 997 F.2d 291, 295 (7th Cir. 1993). Specifically, Rule 702 of the Federal Rules of Evidence ("Rule 702") and the principles set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), govern the admissibility of expert testimony. *Smith v. Ford Motor Co.*, 215 F.3d 713, 717-18 (7th Cir. 2000). Rule 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will

---

[2] Plaintiffs attached a "reply report" from Dr. Thomasson to their response. Defendants filed a motion to strike this report as untimely and containing improper rebuttal. Magistrate Judge Baker issued an Order granting Defendants' motion to strike. (Docket # 284). Plaintiffs filed objections to this Order, but this court overruled those objections. (Docket # 301). Accordingly, Dr. Thomasson's reply report has not been considered for this motion.

>help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702. At bottom, the court must ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597.

The Seventh Circuit has set forth a three-step analysis for determining whether expert testimony is both relevant and reliable: (1) the witness must be qualified as an expert by knowledge, skill, experience, training, or education; (2) the expert's reasoning or methodology underlying the testimony must be scientifically reliable; and (3) the testimony must assist the trier of fact to understand the evidence or determine a fact in issue. *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007) (citations and internal quotations omitted). Here, Defendants challenge both the reliability and relevancy of Dr. Thomasson's report and testimony.

### 1. Qualifications

As Plaintiffs contend, and Defendants do not challenge, Dr. Thomasson is qualified for purposes of Rule 702. Dr. Thomasson is a health care economist with impressive credentials, earning her Ph.D. in economics from the University of Arizona. (Thomasson Report 1). She is a Research Associate for the National Bureau of Economic Research and her studies have been cited in the *New England Journal of Medicine* and the *Yale Law Journal*. (*Id.*). The court, therefore, focuses on the methodology prong in determining the reliability of Dr. Thomasson's opinions.

5

### 2. Methodology

Even though Defendants concede that Dr. Thomasson is an expert, she "cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method." *Smith*, 215 F.3d at 718. Indeed, an "expert['s] work is admissible only to the extent it is reasoned, uses the methods of the discipline, and is founded on data. Talking off the cuff – deploying neither data nor analysis – is not an acceptable methodology." *Lang v. Kohl's Food Stores, Inc*., 217 F.3d 919, 924 (7th Cir. 2000) (citations omitted*); see also Comer v. Am. Elec. Power*, 63 F. Supp. 2d 927, 933 (N.D. Ind. 1999) (stating the court must "rule out subjective belief and speculation"). In other words, the court must determine whether her opinion is grounded in the methods and procedures of science and whether such testimony has sufficient factual underpinnings. *Bourelle v. Crown Equip. Corp*., 220 F.3d 532, 536 (7th Cir. 2000); *see also Allgood v. Gen. Motors Corp*., No. 1:02-cv-1077, 2006 WL 2669337, at *3 (S.D. Ind. Sept. 18, 2006) (explaining that the "court must determine that the data support an admissible expert's opinion by more than merely the say-so of the expert"). The court uses the following factors articulated in *Daubert* in assessing an expert's methodology:

> (1) Whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the technique or method has been met with general acceptance.

509 U.S. at 593-94.

The *Daubert* standard "applies to all expert testimony, whether it relates to an area of traditional scientific competence or whether it is founded on engineering principles or other technical or specialized expertise." *Smith*, 215 F.3d at 719. That said, this is not a definitive checklist as the court is free to "fashion an approach more precisely tailored to an evaluation of the particular evidentiary submission before it." *United States v. Conn*, 297 F.3d 548, 556 (7th Cir. 2002); *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999) (stating "the test of reliability is 'flexible,' and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case"). Lastly, in making this evaluation, the court must focus "solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595; *see also Smith*, 215 F.3d at 718 (explaining that the "soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact").

Defendants oppose the methodology used by Dr. Thomasson for the following reasons: (1) she did not follow the scientific method; (2) her analysis does not account for multiple variables and does not have an error rate; (3) her analysis for this case does not contain the same vigor as her own research; and (4) no general acceptance exists in the economic community.

### a. Failure to Follow Scientific Method

The "first and most significant *Daubert* factor is whether the proffered opinion has been subjected to the scientific method." *Cummins v. Lyle Indus.*, 93 F.3d 362, 368 (7th Cir. 1996). Here, Dr. Thomasson conceded in her testimony that she did not subject her

opinion to the scientific method. Dr. Thomasson explained that in performing research pursuant to the scientific method, she would "develop hypotheses," "gather data," "statistically test those hypotheses," and "draw conclusions." (Deposition of Melissa Thomasson ("Thomasson Dep.") 35:12-18). In her research for this case, however, she stated that she was "not doing basic economic research." (*Id*. at 35:19-20; *see also id.* at 37:11-13 (referring to the analysis performed in this case, "This isn't really research.")). Dr. Thomasson collected data and calculated damages, which she deemed her conclusions in this case. (*Id*. at 37:3-4, 38:9-15). But Dr. Thomasson admitted that in this case, she did not have a hypothesis "in the research sense" when reaching her opinions. (*Id*. at 36:15-18). Nor did she "statistically test" her opinions. (*Id*. at 37:5-7). It is therefore clear that Dr. Thomasson did not follow the scientific method as she typically would in her own research.

     Plaintiffs respond that expert testimony and methodology does not have to be based on the scientific method, as not all experts are scientists. This argument fails because economists must still follow the scientific method in conducting their research. *See Ollis v. Knecht*, 751 N.E.2d 825, 828-29 (Ind. Ct. App. 2001) (stating "[e]conomics is the science that deals with the production, distribution, and consumption of wealth, and with the various related problems of labor, finance, taxation, etc."; "[d]isciplines that are sciences employ the scientific method: . . . [which] include[s] rules for concept formation, conduct of observations and experiments, and validation of hypotheses by observations or experiments") (internal quotations and citations omitted)). Indeed, the Indiana Court of Appeals concluded "social sciences like economics . . . which employ

8

the scientific method, are sciences, and experts from those fields should be prepared to have their opinions and theories subjected to an analysis under Indiana Evidence Rule 702(b)."[3] *Id*. at 829; *see also Kikalos v. United States*, 308 F. Supp. 2d 902, 905-06 (N.D. Ind. 2003) (finding expert opinion reliable and based on the scientific method where expert, among other things, applied generally accepted theories of economics and pricing to determine likely retail markup and then tested it for reliability). Thus, it is appropriate to examine Dr. Thomasson's use of, or lack of, the scientific method in her research.

Plaintiffs further argue that Dr. Thomasson's opinions involve "technical" or "other specialized knowledge" and thus, the scientific method should not apply. But even if the court considered her opinions as such, that does not relieve Plaintiffs from *Daubert* and Rule 702. Instead, "a trial court should consider the specific factors identified in *Daubert* where they are reasonable measures of reliability of expert testimony." *Kumho*, 526 U.S. at 152. Moreover, even assuming the scientific method should not apply here, Plaintiffs have not offered any factors by which Dr. Thomasson's opinions should be assessed instead.

Rather, Plaintiffs offer the conclusory opinion in their brief – without any support from the record – that Dr. Thomasson "developed a hypothesis, based on well-accepted economic principles, that damages could be calculated based on the 'actuarially fair

---

[3] This rule of evidence in Indiana is analogous to Rule 702. *Compare* IND. R. EVID. 702(b) ("Expert scientific testimony is admissible only if the court is satisfied that the scientific principles upon which the expert testimony rests are reliable"), *with* FED. R. EVID. 702(c) ("A witness who is qualified as an expert . . . may testify . . . if the testimony is the product of reliable principles and methods").

9

premium'; tested her hypothesis in every reasonable way by using a formula that produces the same answer every time; and drew conclusions, namely the measure of data, from her formula." Of course, neither Plaintiffs nor Dr. Thomasson list these "well-accepted economic principles" or ways the hypothesis was tested "in every reasonable way." In fact, Plaintiffs' statement about thorough testing is contradicted by Dr. Thomasson's deposition testimony. (*See* Thomasson Dep. 33:24-34:10 (stating she did not test her hypothesis in this case)).

Lastly, Plaintiffs' contention that Dr. Thomasson's methodology "produces the same answer every time" is problematic. Although consistency in one's results may be a relevant factor in evaluating the reliability of methodology, that cannot be dispositive; indeed, if one is using the same unsound formula for each calculation, then that formula will consistently produce incorrect results. In sum, Plaintiffs have neither shown that Dr. Thomasson's opinions were subjected to the scientific method nor explained why this factor is not applicable. Thus, this factor weighs for exclusion.

### b. Lack of Error Rate and Failure to Account for Multiple Variables

Relatedly, the known or potential rate of error is a key factor in determining the reliability of an expert's methodology. *Daubert*, 509 U.S. at 594. Dr. Thomasson admits that no such analysis has taken place. (Thomasson Dep. 37:5-7). Moreover, Defendants list several situations which would alter Dr. Thomasson's calculation, though she did not account for any of them. (*See id*. 71:22-72:9 (retroactive reimbursement); *id*. at 211:6-9 (spend-downs); *id*. at 213:10-25 (Medicaid beneficiaries paying a premium); *id*. at

10

116:16-117:16) (dual insurance coverage)).  Plaintiffs do not respond to either of these criticisms and thus the court finds they have implicitly waived their objection to this factor.  *Coleman v. Highland Police Dept.*, No. 2:05-cv-416, 2007 WL 294278, at *3 (N.D.Ind. Jan. 26, 2007) (finding that plaintiffs' failure to address an argument in their response waives "any argument to the contrary").  Even assuming Plaintiffs did oppose this argument, Dr. Thomasson's failure to test her analysis and to account for several variables weighs in favor of exclusion.  *See Chapman v. Maytag Corp.*, 297 F.3d 682, 688 (7th Cir. 2002) (excluding expert testimony where the lack of any studies, tests, or experiments to justify or verify the expert's conclusions led the court to finding opinions as nothing more than "unverified statements unsupported by scientific methodology"); *CDW LLC v. NETech Corp.*, 906 F. Supp. 2d 815, 827 (S.D. Ind. 2012) (stating that "[w]hen an expert's opinion fails to account for obvious 'salient explanatory variables,' it is too unreliable for admissibility under Rule 702").

### c.  Failure to Employ Same Level of Intellectual Rigor

The court must make certain that "an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho*, 526 U.S. at 152; *Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940, 942 (7th Cir. 1997) (judge must be satisfied that "the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting"); *see also* FED. R. EVID. 702 Advisory Committee's Notes (2000 Amends.) (suggesting alternative benchmarks for gauging reliability, including whether the testimony relates to "matters growing

11

naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying").

Here, it is clear that Dr. Thomasson did not follow the same procedure as when she conducts research in her field. Indeed, Dr. Thomasson testified:

> **Q:** . . . In this case, was it your understanding there was a different scientific process to follow with regards to reaching your opinion in this case than you would follow in your research?
>
> **A:** Yes.
>
> **Q:** And if I understand it from before, the process we followed in this case was a truncated process, you didn't go through all the steps of the scientific process? . . .
>
> **A:** It's different than when I perform research.

(Thomasson Dep. 34:20-35:6). Dr. Thomasson admitted she was "not doing basic economic research," did not have a hypothesis, and did not test her opinion. (*Id*. at 35:12-36:2, 36:15-18, 37:5-7). No matter how Dr. Thomasson attempts to distinguish this research from that using the scientific method, it is clear she did not use the same thoroughness in her analysis here. *See American Honda*, 600 F.3d at 818 (rejecting expert for "not being as thorough as he might otherwise be" where he used a sample size of one to extrapolate his conclusions).

Plaintiffs attempt to explain the incongruity between Dr. Thomasson's methods in her research work and her work in this case. Specifically, Plaintiffs argue that Dr. Thomasson uses the scientific method for issues of a "scientific" basis but for the damage calculation here she relied on her "knowledge base as a healthcare economist." But Plaintiffs do not explain how this knowledge base helped form this opinion. Dr.

Thomasson does not go through any type of scientific process to arrive at her formula for damages; instead, she jumps to concluding the calculation is valid despite lack of support in, or reliance on, the economic community. *See Zenith*, 395 F.3d at 419 ("An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process."). This is nothing more than an *ipse dixit* opinion. *See id.* (noting that a "witness who invokes 'my expertise' rather than analytic strategies widely used by specialists is not an expert as Rule 702 defines that term"). Accordingly, Dr. Thomasson's failure to follow the same method as used in her own research favors exclusion.

### d.  No Acceptance of Methodology

Lastly, Defendants criticize the lack of support for Dr. Thomasson's methodology, from either peer-reviewed articles, in particular, or the economic community, generally. Particularly, Dr. Thomasson testified she was not aware of any studies, articles or publications that used her method for calculating damages of persons deprived of health insurance. (Thomasson Dep. 126:22-127:11, 129:15-130:2). And the studies cited in her report were not relied upon to form her opinions; rather, they were "relied on in starting to frame the context of interrupted health insurance coverage." (*Id.* at 97:8-12, 104:6-17, 107:8-12, 129:2-7).

Moreover, Defendants point to Dr. Thomasson's failure to use the method of comparing the "actual" versus the "but-for" world in calculating damages – a method which is well-accepted in the economic community. (*See* Dr. John H. Johnson Expert Report ¶ 16). Specifically, this method reflects "the difference between what would have

happened 'but for' the harmful act and what actually did happen." (*Id*.). For example, in this case, damages would be determined by comparing the "but-for world" in which Medicaid coverage was not disrupted to the actual world in which Medicaid coverage was disrupted. (*Id*.). Dr. Thomasson, however, did not perform such an analysis and deemed it not necessary. (Thomasson Dep. 186:25-187:20). At bottom, this leaves a shaky foundation on which Dr. Thomasson's opinions are built. *See Happel v. Walmart Stores, Inc*., 602 F.3d 820, 825-26 (7th Cir. 2010) (upholding exclusion of medical expert where he only relied on his past experience and temporal proximity of symptoms instead of offering any scientific data or relying on treatises and medical tests).

Of course, Plaintiffs correctly point out that these are only two of the non-exhaustive list of factors set forth in *Daubert*. And "general acceptance" is not a necessary precondition to the admissibility of expert evidence, as different methods may exist. *Daubert*, 509 U.S. at 597. It does, however, cast doubt over her method's reliability when she cannot point to anyone in the economic community who has used it. It is not sufficient for Plaintiffs to rely on the conclusory statement, without any citation to the evidence or other authority, that Dr. Thomasson's "methodology to calculate damages . . . is based upon economically valid principles." Accordingly, this factor favors exclusion.

In conclusion, Plaintiffs fail to articulate why Dr. Thomasson's report and testimony are reliable under Rule 702. Plaintiffs attempt to hide behind the flexibility of the *Daubert* factors and its case-by-case application to expert evidence. But in the midst of explaining why each *Daubert* factor does not apply, they have not articulated any

14

factors which weigh in favor of reliability. Such *ipse dixit* opinions cannot stand. *See Kirstein v. Parks Corp.,* 159 F.3d 1065, 1067-68 (7th Cir. 1998) (upholding expert's exclusion despite his "impressive credentials" where he did no testing on the products at issue, did not provide studies which employed such testing, and offered only speculation). Accordingly, Dr. Thomasson's opinions are excluded for failure to meet the reliability requirements of Rule 702.

### 3. Relevance

Because the court has deemed Dr. Thomasson's opinions as unreliable for purposes of Rule 702, it is not necessary for the court to evaluate the relevance of the testimony. *See Allen v. LTV Steel Co.*, 68 F. App'x 718, 721 (7th Cir. 2003) (upholding district court's ruling where it excluded expert report on reliability grounds and therefore did not address relevancy). Nevertheless, the court will address Defendants' arguments as a matter of completeness and to note additional reasons for excluding Dr. Thomasson's opinion.

In determining the relevance of proposed expert opinions, the court must ensure that it will "assist the trier of fact to understand the evidence or determine a fact in issue." *Daubert*, 509 U.S. at 591. In other words, "the suggested . . . testimony must 'fit' the issue to which the expert is testifying." *Chapman*, 297 F.3d at 687 (citation omitted). The Supreme Court further explained the test for "fit" as whether expert testimony is "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Daubert*, 509 U.S. at 591 (quoting *United States v. Downing*, 753 F.2d 1224,

15

1242 (3d Cir. 1985)).  Put another way, there must be a "valid scientific connection to the pertinent inquiry as a precondition to admissibility."  *Id*. at  591-92.

Here, the ability to calculate damages on a classwide basis is certainly relevant on its face because it is critical to whether questions common to the class predominate for purposes of Rule 23(b)(3).  Defendants' arguments, however, focus on how Dr. Thomasson's proposed calculation is neither an accurate portrayal of the damages incurred in this case nor the correct population set from which to extrapolate damages.  As a result, Defendants argue this calculation will not be helpful to the jury.  The court now examines each of these challenges.

### a. Failure to Include Actual Damages

Defendants claim that the "actuarially fair premium" calculated by Dr. Thomasson does not fit the case here because the appropriate calculation in the Seventh Circuit for damages due to interrupted insurance involves actual damages.  *See, e.g. Mira v. Nuclear Measurements Corp*., 107 F.3d 466, 473 (7th Cir. 1997) (holding plaintiffs suffered no economic loss where employer unknowingly cancelled employees' group insurance coverage because the plan was reinstated and employees were reimbursed for any and all claims filed during the period in question); *Kossman v. Calumet Cnty.*, 800 F.2d 697, 703-04 (7th Cir. 1986), *overruled on other grounds*, *Coston v. Plitt Theatres, Inc*., 860 F.2d 834 (7th Cir. 1988) (finding plaintiffs may not recover the cost of insurance benefits unless they establish they incurred expenses in securing alternative insurance coverage or incurred medical expenses that would have been covered had they not been terminated); *Chapin v. Fort-Rohr Motors, Inc*., No. 1:06-cv-34, 2009 WL 89658, at *5 (N.D. Ind. Jan.

13, 2009) (rejecting plaintiff's argument to include medical insurance in back pay award because "to recover for lost insurance coverage, a plaintiff must show that he either incurred expenses in securing alternative insurance coverage or incurred medical expenses that would have been covered under the employer's insurance program"); *Sykes v. Target Stores*, No. 00-C-5112, 2002 WL 554505, at *5 (N.D. Ill. Apr. 15, 2002) (concluding that the correct measure of damages in the Seventh Circuit for the value of insurance fringe benefits is "the amount of out-of-pocket expense incurred by the plaintiff to replace the coverage"). Defendants contend, therefore, that Dr. Thomasson's calculation is of no use because it does not even consider this form of damages.

Plaintiffs fail to point to case law in the Seventh Circuit which supports their alternative theory for damages. Plaintiffs respond by simply stating that the valuation method used by Dr. Thomasson is "well accepted in the field of economics." Again, Plaintiffs do not cite any sources or reference any evidence to support this statement. Plaintiffs go on to argue that the insurance premiums calculated "reflect what [Medicaid beneficiaries] pay for"[4] and implore the court that using a different methodology does not diminish its relevance.

The court is careful here not to focus on which damage theory is correct; indeed, the "trial court is limited to determining whether the expert testimony is pertinent to an issue in the case and whether the methodology underlying that testimony is sound." *Smith,* 215 F.3d at 719; *see also Troutner v. Marten Transp., Ltd*., No. 2:05-cv-40, 2006

---

[4] The court notes the oddity of arguing what the Medicaid beneficiaries "pay for" constitutes their damages when, in reality, most are not paying insurance premiums to receive coverage.

WL 3523542, at *6 (N.D. Ind. Dec. 5, 2006) (stating that an expert's "decision to use one form of scientific methodology . . . as opposed to another . . . goes to the expert's credibility, not the admissibility of his testimony").  That said, the court cannot allow testimony in front of the jury which runs contrary to case law from the Seventh Circuit. If Dr. Thomasson were allowed to opine that an individual who lost her Medicaid benefits was still entitled to damages even though she did not incur any out-of-pocket expenses, then this would do just that.  *Compare* (Thomasson Dep. 198:6-21 (stating damage amount is the same whether or not person incurs medical expenses during period without coverage)), *with Mira*, 107 F.3d at 473 ("It is a longstanding principle in civil law that there can be no monetary recovery unless the plaintiff has suffered harm"). Though the court is mindful that even "shaky" expert testimony may be addressed by cross-examination, this leeway is halted when the opinions will likely confuse the jurors. That is the case here and thus, this is yet another factor meriting exclusion.

### b.     Inclusion of Members Outside Purported Class in Calculations

Finally, Defendants argue that Dr. Thomasson's calculations are irrelevant to this case because they are based on the health care expenditures of *all* Indiana Medicaid recipients during the applicable time period.  (*See* Thomasson Report 12 (stating an "estimate of [the] premium" equals the "total annual medical expenditures" divided by the "number of Medicaid eligibles")).  By contrast, the proposed class only includes individuals who had their Medicaid benefits terminated pending an appeal. Consequently, Dr. Thomasson's calculation is based on the expenditures of individuals

not in the purported class.  Defendants argue that Dr. Thomasson thus ignores the actual make-up of the purported class and, as a result, her methodology including all Medicaid eligible persons is irrelevant.  Plaintiffs, on the other hand, contend that this argument does not address the validity of the calculation, but only goes towards how damages will be allocated – an issue not relevant at this time.

Dr. Thomasson has not taken any steps to ensure that Indiana's total Medicaid expenditures are representative and proportional to the healthcare-related expenditures for the proposed class.  (*See* Thomasson Dep. 82:8-84:3).  Instead, she assumes that the class has the "same makeup" as those eligible for Medicaid in Indiana.  (*Id*. at 83:7-9; *see also id*. at 83:22-84:3 (testifying "the way that I've calculated the damage on the non-individualized basis assumes that the makeup of the class reflects the makeup of the Indiana Medicaid population.  If that is not true, then the calculations would have to be adjusted because the makeup of the class would have [been] different – could have different expenditures")).  Such speculation is not sufficient for the court to deem Dr. Thomasson's calculation relevant to the proposed class.  Accordingly, this factor also favors exclusion.

### III.   Conclusion

The court finds that Dr. Thomasson's opinions are neither reliable nor relevant pursuant to the principles set forth in *Daubert* and Rule 702.  Accordingly, Defendants'

motion to exclude the expert opinions of Dr. Melissa A. Thomasson (Docket # 244) is

**GRANTED**.

**SO ORDERED** this 16th day of August 2013.

_____
RICHARD L. YOUNG, CHIEF JUDGE
United States District Court
Southern District of Indiana


Distributed Electronically to Registered Counsel of Record.