UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JAMES BOWMAN, as next friend for J.B., and MELISSA GIBSON, as next friend for COURTNEY ANDERSON, on behalf of themselves and others similarly situated, | ) ) ) ) ) | |
| Plaintiffs, | ) | |
| | ) | 1:11-cv-0593 RLY-TAB |
| *vs.* | ) | |
| | ) | |
| INTERNATIONAL BUSINESS MACHINES CORPORATION, ACS HUMAN SERVICES, LLC, PHOENIX DATA CORPORATION and ARBOR E&T, LLC, | ) ) ) ) ) | |
| Defendants. | ) | |

**UNDER SEAL: ENTRY ON PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

This matter arises out of a putative class action involving Medicaid recipients who received a notice that their benefits would be terminated and appealed their termination in a timely manner; their benefits, however, were interrupted or not continued pending a fair hearing of their appeal.  Plaintiffs now move to certify the class.  For the reasons set forth below, the court **DENIES** Plaintiffs' motion for class certification.

**I.      Background**

**A.  The Legacy System**

The Family and Social Services Administration ("FSSA") of the State of Indiana administers the State's Medicaid program.  (Compl. ¶ 4).  When the FSSA had sole control over the system, it was predominately paper-driven, as applicants and

beneficiaries were each assigned to a single FSSA caseworker and were required to provide paper documentation to the FSSA through the local county office. (Affidavit of John Lyons ("Lyons Aff.") ¶¶ 7-8). Caseworkers maintained each client's supporting documentation in paper files at the local offices while also utilizing a rudimentary computer system – Indiana Client Eligibility System ("ICES") – that required manual data entry. (*Id*. at ¶¶ 8-9). In the midst of an increasing number of applications for public assistance and high error rates, the State looked to modernize and improve the Medicaid system. (*Id*. at ¶¶ 10-11).

### B. Master Services Agreement

In December 2006, IBM entered into a Master Services Agreement (the "MSA") with the FSSA and assumed the overall management of the eligibility determination process. (Compl. ¶¶ 6-7). IBM then delegated to other contractors, primarily ACS Human Services, LLC, most of the day-to-day responsibilities of working with beneficiaries to determine their eligibility and process their appeals. (*Id*. at ¶¶ 7-8). Other sub-contractors included Arbor E&T, LLC and Phoenix Data Corp. (Lyons Aff. ¶ 13).

The FSSA then transitioned 1,500 state employees into the employ of IBM and its sub-contractors. (Compl. ¶ 9). The FSSA, however, retained final authority to approve or disapprove eligibility; that said, this decision relied on the fact-gathering, computer entries, and recommendations of the IBM Coalition staff when making correct determinations on whether to start, stop, or change Medicaid coverage for an individual. (*Id*. at ¶ 10; Affidavit of Alan R. Jolly ("Jolly Aff.") ¶ 9 (stating that "[o]nly State

employees can authorize eligibility determinations"); MSA 3.1.1 (1)).  The sub-contractors represented themselves as the FSSA to the public by mediating virtually all communications between beneficiaries and the FSSA, displaying the FSSA's signage and official seal, using the FSSA's letterhead, and identifying themselves as representatives of the FSSA to beneficiaries during telephone calls.  (Compl. ¶¶ 10-15).

### C. Transition to Modernized System

The transition from the prior legacy system (the paper-driven system with designated case workers) to the Modernized system involved several steps.  In March 2007, the State divided its 92 counties into those that were run and staffed by State employees only and those in which both State and vendor employees were used.  (Lyons Aff. ¶ 14).  Because these counties were still working with the legacy system, they were known as "As-Is Offices," and further categorized as "State/vendor As-Is local offices" and "State As-Is local offices."  (*Id*. at ¶¶ 16-17).

In October 2007, the vendors and the State began to implement the Modernized system.  (*Id*. at ¶ 19).  This system was intended to be a paperless system with electronic support, and, as a result, give clients multiple access points to submit documentation and communicate with workers.  (Jolly Aff. ¶ 19).  The State implemented the Modernized system on a staggered, region-by-region basis.  (Lyons Aff. ¶¶ 19-27).  The division of State and State/vendor counties remained the same after the roll out of the Modernized system.  (*Id*. at ¶ 28).  After several regions were rolled out, in September 2008, the State and vendors agreed to suspend the rollout of the Modernized system.  (*Id*. at ¶¶ 22-25). As a result, multiple regions were never modernized and instead only operated under the

As-Is model.  (*Id*. at ¶ 26).  As of April 2009, 33 counties continued to operate under the As-Is model, with 18 of those being State As-Is counties in which no vendor processed appeals.  (*Id*., Ex. A).

In September 2009, the State decided to yet again modify its system and announced its intention to transition to a new "Hybrid" system.  (Lyons Aff. ¶ 62).  This system was first implemented in early 2010.  (Deposition of Kim Shaver ("Shaver Dep.") 348:13-20; Deposition of Kris Marshall ("Marshall Dep.") 250:16-24).  Counties were either converted from Modernized to Hybrid, or from As-Is directly to Hybrid.  (Jolly Aff. ¶ 13).  The last As-Is county converted to the Hybrid model in February 2012.  (Marshall Dep. 266:16-17).  IBM, however, was not responsible for activities associated with the Hybrid delivery model.  (Lyons Aff. ¶ 65).  The overlap of these systems created a tangled network in which State workers, vendors, or a combination was responsible for particular actions.  (*Id*. at ¶¶ 48-52; Shaver Dep. 348:5-12 (stating there were as many as three types of Medicaid systems in place at the same time throughout the state – the Hybrid, As-is, and Modernized)).

### D. Termination of MSA

In March 2009, the State of Indiana notified IBM of performance issues that needed to be addressed immediately, including functions critical to eligibility determinations.  (Compl. ¶ 16).  In July 2009, IBM created a Corrective Action Plan attempting to address the deficiencies outlined by the State.  (Pls.' Ex. 24).  Despite IBM's effort to correct these problems, the State terminated the MSA with IBM in December 2009 – seven years before its expiration.  (Compl. ¶ 16).  After the

termination, the FSSA established direct contracts with many of the former sub-

contractors, which continued carrying out their previously delegated functions.  (*Id*. at ¶

17; Jolly Aff. ¶ 7; Affidavit of Dale Mansberger ("Mansberger Aff.") ¶ 4).

### E.  Maintenance of Benefits

During the life of the MSA, a Medicaid beneficiary's due process rights generally

included the right to have the benefits continue while the appeal of a proposed

termination of benefits was pending.  (Compl. ¶ 19).  Also, before terminating benefits,

Defendants had a duty to assess whether a recipient who is no longer qualified under one

Medicaid category might qualify under another category.  (*Id*. at ¶ 26).  When a timely

request for an appeal of a proposed termination or reduction of benefits was made,

Defendants were responsible for assuring that all appropriate steps were taken to maintain

Medicaid coverage for the individual or family without interruption until the appeals

office could hold a fair hearing.  (*Id*. at ¶ 24).

Plaintiffs, J.B. and Courtney Anderson, claim to have been denied their due

process rights as Medicaid beneficiaries.  Anderson had received Medicaid benefits since

shortly after birth; however, her Medicaid disability application was denied in May 2009.

(*Id*. at ¶¶ 39, 44).  On Anderson's behalf, Melissa Gibson filed a timely appeal with the

FSSA that same month.  (*Id*. at ¶ 45).  In June 2009, the sub-contractors re-assessed

Anderson's Medicaid eligibility and processed her case for closure, despite the pending

appeal.  (*Id*. at ¶ 46).  Gibson filed another appeal, yet, on July 1, 2009, Defendants

submitted Anderson's case for termination.  (*Id*. at ¶¶ 47-48).  Anderson did not receive

Medicaid benefits from July 1, 2009, through July 15, 2009, when they were retroactively

reinstated pending her appeal hearing.  (*Id*. at ¶¶ 50-51; Deposition of Courtney Anderson ("Anderson Dep.") 10:18-22; Defs.' Ex. 13 at 9).  Anderson did not suffer any physical injuries during the period in which she was not covered by Medicaid; moreover, she had access to all of her medications during that time.  (Anderson Dep. 10:23-11:25).  Consequently, she did not incur any out-of-pocket medical expenses during this time.  (Defs.' Ex. 9 at 2; Deposition of Melissa Gibson 86:24-87:8).

J.B. also received Medicaid benefits through the FSSA.  (Compl. ¶¶ 58-59).  In April 2009, an FSSA sub-contractor conducted a telephone interview with J.B.'s mother, Loleta Bowman, to determine, among other things, J.B.'s Medicaid eligibility.  (*Id*. at ¶ 60).  Later that month J.B. and his father, James Bowman, who also received benefits, received letters stating that their Medicaid benefits would be discontinued as of May 31, 2009.  (*Id*. at ¶ 63).  James Bowman filed an appeal on May 27, 2009, but in the appeal letter he neither included any identifying information for J.B. nor signed on behalf of any other person.  (Deposition of James Bowman ("James Bowman Dep.") 46:13-47:16).  Moreover, Bowman did not recall submitting an individual appeal request for J.B. (James Bowman Dep. 57:12-60:5).  J.B.'s and his family's Medicaid benefits were terminated on June 1, 2009.  (Compl. ¶¶ 65-66).  Their benefits were not reinstated until December 2009.  (*Id*. at ¶ 67).  Although J.B. did not incur any unreimbursed medical expenses during the time that the Medicaid coverage was terminated, his parents could not afford to pay for J.B.'s asthma medication during this time.  (Defs.' Ex. 9 at 2; James Bowman Dep. 74:2-8; Deposition of Loleta Bowman 176:2-16).

**F. Class Certification**

On June 8, 2012, Plaintiffs moved to certify the following class:

> [A]ll Medicaid recipients in the State of Indiana who timely
> requested a fair hearing to contest the termination of their benefits,
> but whose benefits were nonetheless terminated before a fair hearing
> was held and a ruling was issued.

(Docket # 203).  In support of this motion, Plaintiffs submitted the expert reports of Dr.

Richard Goldstein and Dr. Melissa Thomasson.  Defendants moved to exclude the

testimony and reports of both experts. (Docket ## 244 and 246).  This court granted both

motions.  (Docket ## 305 and 306).  The court now turns to the merits of the motion for

class certification.

**II.      Discussion**

"The class action is 'an exception to the usual rule that litigation is conducted by

and on behalf of the individual named parties only.'"  *Wal-Mart Stores, Inc. v. Dukes*,

180 L.Ed.2d 374 (2011).  A court has broad discretion in determining whether class

certification is appropriate.  *Keele v. Wexler*, 149 F.3d 589, 592 (7th Cir. 1998).  As an

initial matter, the class must be sufficiently definite to permit ascertainment of class

members.  *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006).  Next, Plaintiffs

must satisfy a two-step analysis of Federal Rule of Civil of Procedure 23.  First, Plaintiffs

must satisfy all four requirements of Rule 23(a): (1) numerosity; (2) commonality; (3)

typicality; and (4) adequacy of representation.  *See* FED. R. CIV. P. 23(a).  Second, the

action must also satisfy through evidentiary proof at least one of the conditions of Rule

23(b).  *Comcast Corp. v. Behrend*, 133 S.Ct. 1426, 1432 (2013); *Arreola v. Godinez*, 546

F.3d 788, 794 (7th Cir. 2008).  When certification is sought under Rule 23(b)(3), as Plaintiffs do here, proponents of the class must show: (1) that questions of law or fact common to members of the proposed class predominate over questions affecting only individual members, and (2) that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.  FED. R. CIV. P. 23(b)(3).

Plaintiffs must prove each of these Rule 23 requirements by a preponderance of the evidence.  *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012).  Consequently, a party must go beyond the mere pleading standard and "be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, typicality of claims or defenses, and adequacy of representation, as required by Rule 23(a)."  *Comcast*, 133 S. Ct. at 1432.  Failure to satisfy any of these elements is fatal to class certification.  *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 596 (7th Cir. 1993).  When the court conducts this "rigorous analysis," it will frequently "entail overlap with the merits of the plaintiff's underlying claim."  *Comcast*, 133 S. Ct. at 1432 (citing *Wal-Mart* 131 S. Ct. at 2551); *Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 493 (7th Cir. 2012).  This is because the "class determination generally involves considerations that are meshed in the factual and legal issues comprising the plaintiff's cause of action."  *Comcast*, 133 S. Ct. at 1432 (citation omitted).

Defendants have objected to every requirement for class certification.  The court will now only address the dispositive issues, principally whether the class (1) is ascertainable; (2) satisfies commonality; and (3) has common issues that predominate.

### A. Ascertainability

"It is axiomatic that for a class action to be certified a 'class' must exist." *Simer v. Rios*, 661 F.2d 655, 669 (7th Cir. 1981). That is, the class description "must be sufficiently definite to permit ascertainment of class members, and 'the description must not be so broad as to include individuals who are without standing to maintain the action on their own behalf.'" *Oshana v. Coca-Cola Bottling Co*., 225 F.R.D. 575, 580 (N.D. Ill. 2005) *aff'd sub nom. Oshana v. Coca-Cola Co*., 472 F.3d 506 (7th Cir. 2006). For instance, an "identifiable class exists if its members can be ascertained by reference to objective criteria." *Nat'l Org. For Women, Inc. v. Scheidler*, 172 F.R.D. 351, 357 (N.D. Ill. 1997); *see also Oshana*, 225 F.R.D. at 580 (stating class membership should be contingent on "objectively ascertainable factors").

On the other hand, a class is not sufficiently defined if "highly individualized inquiries must be made to determine whether a person is a member of the proposed class." *McGarry v. Becher*, No. 4:08-cv-0146, 2010 WL 1257446, at *2 (S.D. Ind. Mar. 24, 2010). That said, "[i]t is not fatal for a class definition to require some inquiry into individual records, so long as the inquiry is not 'so daunting as to make the class definition insufficient.'" *Sadler v. Midland Credit Mgt., Inc*., No. 06-C-5045, 2008 WL 2692274, at *3 (N.D.Ill. July 3, 2008) (quoting *Lau v. Arrow Fin. Servs*., LLC, 245 F.R.D. 620, 624 (N.D.Ill. 2007)). In fact, a class is identifiable if the information necessary to identify class members is available through a "ministerial review" rather than an arduous individual inquiry. *Id*; *see also Sadler v. Midland Credit Mgmt., Inc*., No. 06-C-5045, 2009 WL 901479, at *2 (N.D.Ill.2009) (certifying class where potential

9

manual review to weed out false positives "might prove administratively burdensome, but a review for such straightforward objective criteria nevertheless remains ministerial in nature") (internal citation omitted).

Here, Plaintiffs failed to identify a method to identify the proposed class without requiring case-by-case analysis.  Of course, Plaintiffs attempted to rely on Dr. Richard Goldstein's report to identify a method of selecting potential class members on an objective and systematic basis, but as noted above, this court excluded his opinions. (Docket # 305).  Consequently, Plaintiffs have no evidence to establish how their proposed class will be identified without resorting to individualized inquiries.  Plaintiffs instead repeatedly state that the proposed class can be determined by reference to "objective data" in Indiana's Medicaid database.  (*But see* Deposition of Kathleen McCain ("McCain Dep.") 129:24-130:5 (stating the ICES report that the State has is not "currently accurate" as to which beneficiaries should have received continuing benefits but did not); Deposition of Matthew Rager 77:22-78:3 (30(b)(6) witness for vendor, RCR Technology Group, stating that no extract or report from the data in WFMS or FACTS contains sufficient data to determine whether someone was legally entitled to continued benefits pending an appeal)).  Aside from this conclusory statement, Plaintiffs point to no evidence supporting this claim.

In fact, Plaintiffs' argument is directly contradicted by several witnesses with extensive experience using the computer programs used in conjunction with Medicaid, such as ICES and WFMS.  Each witness testified to the necessity of evaluating cases one-

by-one to identify any beneficiaries who were wrongfully deprived of continued benefits.

For example, Joseph Reyes, an employee of First Data Corporation,[1] testified:

> **Q:** The reason First Data conducted case-by-case reviews is that reports from ICES and WFMS do not accurately tell you whether a group of beneficiaries' benefits were properly maintained during an appeal; is that right?
>
> **A:** Yes.
>
> **Q:** As of today, the only way to accurately identify which particular Medicaid beneficiaries were eligible for continuing benefits pending an appeal but did not receive them is to open each case file and evaluate every case individually; is that right?
>
> **A:** Yes . . .
>
> **Q:** And this case-by-case review requires the exercise of subjective judgment and discretion; correct?
>
> **A:** Yes.

(Deposition of Joseph Reyes ("Reyes Dep.") 171:18-172:10).  Similarly, Kathleen

McCain, a project manager with First Data Corporation, agreed that "as of today, the only

way to accurately determine which particular cases were eligible for continuing benefits

but did not receive continuing benefits is to open each case and evaluate each case file

individually."  (McCain Dep. 131:4-132:3).  And James Perez, an employee of Deloitte

Consulting,[2] also testified that an individual case review would be necessary to

"accurately identify which particular Medicaid beneficiaries were legally entitled to

---

[1] Pursuant to a settlement agreement arising from alleged improper terminations under Indiana's Medicaid system, the State contracted with First Data Corporation to audit cases involving an interruption in Medicaid benefits and determine whether benefits were properly maintained following a timely appeal.  *See Daugherty v. Roob*, No. 1:06-cv-878 (S.D. Ind. March 31, 2009).
[2] Deloitte Consulting was not a vendor of the State; rather, it contracted directly with the FSSA. (Lyons Aff. ¶ 36).  Deloitte has been the FSSA's contractor for maintenance of ICES since the system was created in the 1990's.  (Perez Dep. 76:24-77:3)

continuing benefits pending an appeal but did not receive them."  (Deposition of James Perez ("Perez Dep.") 79:2-7).

Further, this individual inquiry cannot merely be considered as ministerial, as it required a series of steps that required subjective judgment.  (*See* Reyes Dep. 161:23-164:5 (describing the multiple screens and steps required in identifying whether a person was eligible for continuing benefits and stating the need to review the case as a whole while exercising subjective judgment or discretion); McCain Dep. 115:17-118:6 (testifying that several ICES or WFMS screens and caseworker notes were reviewed in determining how case was processed, and First Data employees were required to exercise judgment in several of those steps); Shaver Dep. 357:8-23 (describing the need to have a "pretty deep dive" into an individual case to determine how a task was processed in a given case at a Modernized local office)).

This type of review is analogous to that required in *Jamie S. v. Milwaukee Public Schools*, 668 F.3d 481 (7th Cir. 2012).  There, a special education student brought a putative class against a public school district alleging violations of obligations under the Individuals with Disabilities Education Act ("IDEA").  *Id*. at 485.  The district court certified a class involving:

> all disabled students eligible for special education from [Milwaukee Public School System] who were not identified as potentially eligible for services, not timely referred for evaluation after identification, not timely evaluated after referral, not evaluated in a properly constituted IEP meeting, or whose parents did not (for whatever reason) attend an otherwise proper IEP meeting.

*Id*. at 495.   The Seventh Circuit vacated the class-certification order because the claims were "highly individualized and vastly diverse" and thus unsuitable for class-action treatment.  *Id*. at 486.  Specifically, the Court noted that "identifying disabled students who might be eligible for special-education services is a complex, highly individualized task, and cannot be reduced to the application of a set of simple, objective criteria.  Every step of the child-find inquiry and IEP process under the IDEA is child specific and requires the application of trained and particularized professional educational judgment."  *Id*. at 496.  Accordingly, the Court deemed the purported class as "inherently too indefinite to be certified."  *Id*.

So too here, such individualized inquiry and particularized professional judgment are necessary to determine the class.  Several steps across multiple programs are necessary to determine which individuals had their benefits improperly interrupted.  Further, individuals with particularized knowledge of both Medicaid and the corresponding computer systems would be forced to make a subjective interpretation of handwritten notes, among other items, in deciding who belonged in the class.  This is far from a mere reference to objective criteria to determine the class.

Moreover, Plaintiffs' proposed class is not ascertainable because the class definition is overbroad.  *See e.g., Oshana*, 472 F.3d at 514 (rejecting class definition as overbroad where "countless members of [the plaintiff's] putative class could not show any damage, let alone damages proximately caused by [the defendant's] alleged deception").  Plaintiffs attempt to certify a class including all Medicaid recipients who timely requested a hearing but did not receive continuing benefits prior to the appeal.

13

This is problematic.  Even assuming Plaintiffs could objectively determine who filed a timely appeal, this action does not automatically entitle a person to continuing benefits. (*See e.g.,* McCain Dep. 118:23-120:10 (stating persons who withdrew the appeal or failed to pay their "POWER account" were not eligible for continuing benefits despite a timely appeal); Reyes Dep. 119:21-24 (testifying that a denial of an application would never be subject to maintenance of benefits pending appeal); Deposition of Janet Sanford ("Sanford Dep.") 98:24-99:15 (testifying that a person is not entitled to continuing benefits despite timely appeal if person failed to pay premium)).  Thus, the proposed class contains members who are "without standing to maintain the action on their own behalf" since they were not legally entitled to continued benefits.  *Oshana*, 225 F.R.D. at 580.

Lastly, Plaintiffs argue that Defendants' own conduct has created any obstacles in ascertaining the class and thus, Defendants should not benefit from their own shoddy record-keeping.  This argument misses the point.  The Defendants are not claiming it is impossible to determine whose benefits were improperly terminated; rather, they are stating that it is impossible to conduct this inquiry in a manner conducive to classwide resolution – that is, on a systematic, objective basis without resorting to a case-by-case inquiry.  The reasons for this difficulty stem not only from the limitations of the computer systems involved (most of which were in place prior to Defendants' involvement), but also from the various reasons – and legal implications – for the discontinuation of benefits.  Neither of these impediments can be placed at the hands of Defendants.  Accordingly, the class is fatally indefinite.

14

### B.  Commonality under Rule 23(a)(2)

Rule 23(a)(2) requires Plaintiffs to show that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2).  Even a single common question will satisfy this requirement. *Wal-Mart*, 131 S. Ct. at 2556.  But this requirement should not be reduced to mere superficial similarities such as whether all class members "suffered a violation of the same provision of law." *Id*.  Instead, "[c]ommonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" *Id*. at 2551 (citing *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1982)).  In other words, their "claims must depend upon a common contention" that is "of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each of the claims in one stroke." *Id*. Indeed, as the Supreme Court noted, "What matters to class certification . . . is not the raising of common 'questions' – even in droves – but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of litigation." *Id*. (quoting Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U.L.Rev. 97, 132 (2009)).

Plaintiffs argue that this is a "low hurdle" and list several questions of law and fact that they claim are common to the class, including:

> (1)     Did Defendants fail the steps they were required to take to assure that Plaintiffs who filed timely appeals could proceed to appeal without losing their access to health care?

> (2)     Did Plaintiffs and the Class experience interruptions or terminations in their benefits while a timely fair hearing request was pending?

(3)      Did Defendants' actions violate Section 1983?

(4)      Did Defendants' actions constitute common law negligence?

(5)      Did the loss of Medicaid to the Class result in damages?

(6)      If the Class was damaged, what was the amount of the damage?

Defendants contend that none of these questions satisfy the commonality standard

because "none can be answered for all class members 'in one stroke.'"  *Wal-Mart*, 131 S.

Ct. at 2551.

The court again looks to *Jamie S*. for guidance.  668 F.3d 481.  There, Plaintiffs

proposed the following common issue to satisfy Rule 23(a)(2): "[A]ll potential class

members have suffered as a result of MPS' failure to ensure their Child Find rights under

IDEA and Wisconsin law."  *Id*. at 497.  The Seventh Circuit found that pointing to the

"bottom-line liability question in any individual plaintiff's IDEA claim" did not satisfy

the commonality issue; rather, "plaintiffs must show that they share some question of law

or fact that can be answered *all at once* and that the *single answer* to that question will

resolve a central issue in all class members' claims."  *Id*. (emphasis in original).  It was

not enough that class members all suffered as a result of individual IDEA violations,

because that "does not establish that the individual claims have any question of law or

fact in common."  *Id*.  To emphasize this point, the Court proposed two hypotheticals

involving violations of the IDEA.  *Id*. at 498.  Although the generic question of whether

the defendant fulfilled its IDEA obligations was part of both claims, the *answers* to these

questions were unique to each child's particular situation based on individualized

16

questions of fact and law.  *Id*.  Accordingly, the Court held the purported class lacked any common questions.  *Id*.

Much like *Jamie S.*, Plaintiffs here propose a class hinging on a violation of the same individual rights.  And though each class member may have suffered from the same due process violations, the answer to each individual's claim is unique to that individual's situation based on individualized questions of fact and law.  Indeed, the resolution of J.B.'s or Anderson's claims may have no effect on the class members' claims.  A myriad of circumstances and complexities exist which require not only an individualized review of the case to determine who is eligible, but also an individualized determination as to *who* is liable and the appropriate remedy.  Thus, the mere "bottom-line liability" questions Plaintiffs set forth are not sufficient to satisfy the commonality requirement.

Plaintiffs attempt to distinguish *Wal-Mart* and *Jamie S.* on the grounds that the "reason" for Medicaid termination is not the crux of the matter here; rather, the termination of benefits is a simple "yes-no question" and the question of liability is a legal one that is common to the class.  But there are several problems with this simplification.  First, as has been pointed out, there are various reasons why one is not legally entitled to continued benefits despite a timely appeal, so this immediately removes this question from the "yes-no" variety and into the more complicated *Wal-Mart* type.  Moreover, this case does not involve one defendant allegedly causing harm to an entire class – different Defendants (and in some instances no Defendants) were involved with each beneficiary's case.  (Lyons Aff. ¶¶ 51-52; Shaver Dep. 356:8-357:2 (testifying that it was possible in Modernized offices for a State worker to do everything related to

17

processing an appeal without any involvement from a vendor)).  Hence, a simple "yes-no" determination for a class representative could have no effect on the claims of the other class members.  This is precisely what *Wal-Mart* intended to prevent.

That said, as *Wal-Mart* and *Jamie S.* noted, an illegal policy may provide the "glue" necessary to litigate otherwise highly individualized claims as a class.  But the contracts at issue here clearly state that the Defendants were obligated to follow the laws related to the maintenance of benefits; likewise, Defendants also maintained policies to follow all laws.  MSA at ¶ 7.1.1 ("Vendor shall comply with, and shall require each Subcontractor to comply with, all Laws that are applicable to Vendor or such Subcontractor, as the case may be, in its and their performance of this Agreement and the Services . . . ."); (Lyons Aff. ¶¶ 59-61; Jolly Aff. ¶¶ 37-41; Affidavit of Ryan Adams ¶ 9; Mansberger Aff. ¶ 10; Shaver Dep. 339:16-20, 340:2-4).  Any deviation from these requirements cannot be construed as a policy which "glues" these claims together.  Consequently, an examination of a class representative's claim will not produce a common answer for all of the class members' claims for relief.

Finally, the alleged damages for the class do not create a common issue.  The only evidence Plaintiffs set forth for calculating damages on a classwide basis – proposed damages expert, Melissa Thomasson – was excluded by the court.  (Docket # 306).  Plaintiffs have not otherwise explained how damages will be derived on a classwide basis; rather, Plaintiffs rely on pure speculation that damages for the purported class can be calculated on a classwide basis.  This is not sufficient.  *See Comcast*, 133 S.Ct. at 1433 (overruling Court of Appeals ruling that common issues predominated where plaintiffs

simply provided a method to measure and quantify damages on a classwide basis without determining whether the methodology was a just and reasonable inference or merely speculative).  As a result, this issue does not glue the class together but instead highlights how little common ground exists among members of the class.

Moreover, any arguments Plaintiffs make as to classwide damages are undercut by their own briefs.  Plaintiffs reference different forms of damages the class members may have incurred during their time without coverage, such as: (1) the inability to purchase medication or fill prescriptions; (2) stress related to a lack of coverage; and (3) out-of-pocket expenses.  This belies their argument for class certification as each of these would require individualized analysis.  Thus, the calculation of damages does not constitute a common question for the class.  Plaintiffs' claims therefore lack the commonality required by Rule 23(a)(2).

### C.  Rule 23(b)(3)

#### 1.  Common Questions Do Not Predominate

The court's discussion concerning Plaintiffs' failure to satisfy the commonality requirement makes it clear that Plaintiffs also do not satisfy Rule 23(b)(3).  *See Jamie S.*, 668 F.3d at 499 n.6 ("Without even a single common question of law or fact, common questions cannot predominate").  Even assuming Plaintiffs could satisfy Rule 23(a), they could not meet the high burden of Rule 23(b)(3).  *See Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997) (stating the predominance requirement of Rule 23(b)(3) is "far more demanding" than the commonality requirement).  Accordingly, class certification should be denied on this ground as well.

19

### 2. Class Action Not Superior

Finally, as a matter of completeness, the court addresses the other requirement in Rule 23(b)(3) – that a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3). The court looks to four factors in making this determination: (1) the interest of class members in individually controlling the litigation; (2) the extent to which litigation already has been commenced by other members of the class; (3) the desirability of concentrating the litigation in a particular forum; and (4) the management difficulties likely to be encountered. *Id*.

These factors weigh against a class action in this case. The court does appreciate the hardship and unlikelihood of indigent citizens obtaining counsel for claims which may have small value. But that alone does not trump the obstacles in this case. Because of the case management difficulties listed above, it would prove almost impossible for a court to ascertain a class and find a classwide remedy. By contrast, as Defendants noted, the sister of a proposed class representative, Anderson, has already commenced a separate, individual lawsuit against IBM for a maintenance of benefits claim. *See* First Amend. Compl. ¶ 35, *Gibson v. International Business Machines Corporation*, No. 1:10-cv-330 (S.D. Ind. March 19, 2010). This directly contradicts Plaintiffs' assertion that "the alternative to a class action is no action at all." Accordingly, Plaintiffs have not satisfied this requirement.

### III.     Conclusion

The court finds that Plaintiffs do not meet the standards for class certification set

forth in Rule 23.  Accordingly, Plaintiffs' motion for class certification (Docket # 201) is

**DENIED**.

**SO ORDERED** this 19th day of August 2013.

RICHARD L. YOUNG,  CHIEF JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsel of Record.